UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
MIDLAND-ODESSA DIVISION

| | | |
|---|---|---|
| ANGELA ROBINSON, individually; | § | |
| CLARA BUSBY, as next friend, guardian, | § | |
| and parent of and for minors L.H. and T.H.; | § | |
| and RACHEL AMBLER, as independent | § | |
| administrator of, and on behalf of, ANGELA | § | |
| ROBINSON, minors L.H. and T.H., the | § | |
| ESTATE OF SAVION VASHON HALL, and | § | |
| SAVION VASHON HALL'S heirs-at-law, | § | CIVIL ACTION NO. 7:21-CV-111 |
| | § | |
| Plaintiffs, | § | JURY DEMANDED |
| | § | |
| v. | § | |
| | § | |
| MIDLAND COUNTY, TEXAS; SOLUTA, | § | |
| INC.; ADEOLA C. ADESOMI; FLOR | § | |
| ESTRADA; TIMOTHY GENE FORBUSH, | § | |
| JR.; ESTHER EBELE IHEDIWA; LILIAN | § | |
| KERUBO OKERI; KELLY V. ROBINS; and | § | |
| DANIEL T. STICKEL | § | |
| | § | |
| Defendants. | | |

## PLAINTIFFS' ORIGINAL COMPLAINT

> **This is a case of a tragic inmate death resulting from violation of constitutional rights. Defendants' deliberate indifference, objective unreasonableness, and/or policies, practices, and/or customs caused Savion Vashon Hall's suffering and death.**



Table of Contents

I.   Introductory Allegations ................................................................4

     A.   Parties ...........................................................................4

     B.   Jurisdiction and Venue.................................................11

II.  Factual Allegations ..................................................................12

     A.   Introduction ...................................................................12

     B.   Savion Vashon Hall. ....................................................12

     C.   Savion's Death Resulting from Deliberate Indifference in the Midland County Jail ...................................................................12

     D.   Witnesses ......................................................................14

          1.   Adesomi, Adeola C. - Nurse .....................................14

          2.   Estrada, Flor – Nurse ...............................................19

          3.   Forbush, Jr., Timothy Gene – Nurse.........................22

          4.   Ihediwa, Esther Ebele – Nurse .................................31

          5.   Okeri, Lilian Kerubo – Nurse ...................................32

          6.   Robins, Kelly Venell – Nurse ...................................34

          7.   Stickel, Daniel T. - Jailer ........................................35

          8.   Willingham, David Barry - Physician........................35

     E.   Investigations ...............................................................39

          1.   Medical Records and Death Reports.........................39

               a.   EMT Records ....................................................39

               b.   Autopsy .............................................................40

               c.   Custodial Death Report (Filed with Attorney General)..........40

               d.   Inmate Death Reporting Report (Filed with Texas Commission on Jail Standards)................................41

          2.   Midland County Sheriff's Office ...............................41

          3.   Texas Rangers ..........................................................45

          4.   Texas Commission on Jail Standards ........................47

     F.   Defendants' Knowledge and Education.............................47

     G.   Monell Liability of Midland County and Soluta............................48

          1.   Introduction...............................................................48

          2.   Soluta's Agreement and Partnership with Midland County to Provide Medical Care Services to Midland County Jail Prisoners .................49

   3. Midland County and Soluta Policies, Practices, and Customs ............ 50

    a. Policies, Practices, and/or Customs ........................................ 50

    b. Other Deaths in Midland County Jail ...................................... 52

III. Causes of Action ......................................................................................... 55

 A. 14th Amendment Due Process Claims Under 42 U.S.C. § 1983: Objective Reasonableness Pursuant to *Kingsley v. Hendrickson* ................................... 55

 B. Remedies for Violation of Constitutional Rights............................................. 58

 C. Cause of Action Against Individual Defendants and Mr. Stickel Under 42 U.S.C. § 1983 for Violation of Constitutional Rights................................. 59

 D. Cause of Action Against Midland County and Soluta Under 42 U.S.C. § 1983 for Violation of Constitutional Rights ...................................... 65

IV. Concluding Allegations and Prayer ........................................................... 67

 A. Conditions Precedent ...................................................................... 68

 B. Use of Documents at Trial or Pretrial Proceedings ......................................... 68

 C. Jury Demand ................................................................................ 68

 D. Prayer ......................................................................................... 68

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Plaintiffs file this complaint and for cause of action will show the following.

I.      Introductory Allegations

A.      Parties

1.      Plaintiff Angela Robinson ("Ms. Robinson") is a natural person who resided in, was domiciled in, and was a citizen of Texas at all relevant times.  Ms. Robinson sues in her individual capacity, as the natural and legal mother of Savion Vashon Hall, and she seeks all wrongful death and other damages available to her.

2.      Plaintiff Clara Busby ("Ms. Busby") is a natural person who resided in, was domiciled in, and was a citizen of Texas at all relevant times.  Ms. Busby sues as next friend, guardian, and legal parent of and for female minors L.H. and T.H. (children of Savion Vashon Hall), and she seeks all wrongful death and other damages available to those minor children.

3.      Plaintiff Rachel Ambler ("Ms. Ambler") is a natural person who resided in, was domiciled in, and was a citizen of Texas at all relevant times.  Ms. Ambler sues in her capacity as the Independent Administrator of the Estate of Savion Vashon Hall, Deceased.  Savion Vashon Hall is referred to herein at times as "Mr. Hall," "Savion," or the "Decedent."  Ms. Ambler, when asserting claims in this lawsuit as the independent administrator, does so in that capacity on behalf of all of Savion's wrongful death beneficiaries (including Ms. Robinson [Savion's mother], L.H. [Savion's minor daughter], and T.H. [Savion's minor daughter]) and on behalf of Savion's estate and all of Savion's heirs-at-law, including L.H. (Savion's minor daughter) and T.H. (Savion's minor daughter).  All of the people listed in the immediately preceding sentence, other than Ms. Robinson and Ms. Ambler, are collectively referred to herein as the "Claimant Heirs."  Ms. Ambler asserts claims on behalf of, and seeks all survival damages and wrongful death damages available

to, Ms. Robinson and Claimant Heirs. Letters of Independent Administration were issued to Ms. Ambler in April 2021, in Cause Number P20311, in the County Court of Midland County, Texas, in a case styled *Estate of Savion Vashon Hall, Deceased.*

4.      Defendant Midland County, Texas ("Midland County" or the "County") is a Texas county.  Midland County may be served with process pursuant to Federal Rule of Civil Procedure 4(j)(2) by serving its chief executive officer, Honorable County Judge Terry Johnson, at 500 N. Loraine Street, Suite 1100, Midland, Texas 79701, or wherever Honorable Judge Terry Johnson may be found.  Service on such person is also consistent with the manner prescribed by Texas law for serving a summons or like process on a county as a Defendant, as set forth in Texas Civil Practice and Remedies Code Section 17.024(a).  Midland County acted or failed to act at all relevant times through its employees, agents, representatives, jailers, and/or chief policymakers, all of whom acted under color of state law at all relevant times, and is liable for such actions and/or failure to act to the extent allowed by law (including but not necessarily limited to law applicable to claims pursuant to 42 U.S.C. § 1983 and the United States Constitution).  Midland County's policies, practices, and/or customs were moving forces behind and caused, were proximate causes of, and were producing causes of constitutional violations and resulting damages and death referenced in this pleading.  Midland County cannot delegate its constitutional duties to provide medical care, to protect, and/or not to punish its detainees and/or inmates to Soluta and thereby avoid liability for constitutional violations committed by Soluta and/or Soluta agents and/or employees.  Midland County has non-delegable duties to comply with the United States Constitution regarding inmates in its custody.  Therefore, in addition and/or in the alternative to all other allegations made in this complaint, Soluta, to which Midland County entrusted or delegated healthcare for and/or other duties regarding Midland County inmates, and with which it

has acted in such regard, is liable for actions, inaction, policies, practices, and/or customs of Soluta as it relates to claims and damages reference in this complaint.  In the alternative or in addition, Midland County and Soluta acted and/or failed to act together, in a partnership and/or joint enterprise, or pursuant to similar legal principles, to provide or fail to provide care to inmates in Midland County's jail.  Thus, Midland County is liable for Soluta's actions, inactions, policies, practices, and/or customs related to such purported care.

5.      Defendant Soluta, Inc. ("Soluta") is a Texas corporation.  Soluta has also done business under the names "Soluta Health" and "Soluta Health, Inc."  Upon information and belief, the name "Soluta Health, Inc." became inactive on or about April 2, 2015.  Soluta may be served with process by serving its registered agent for service of process, Kevin Chapman, at its registered office, 9401 Amberglen Blvd., Suite 100, Austin, Texas 78729, or wherever Kevin Chapman may be found.  Such service is in accordance with Federal of Civil Procedure 4(h)(1)(A), which provides that service of process may be made in the manner prescribed by Rule 4(e)(1) for serving an individual. Rule 4(e)(1) provides that service on an individual may be made in the manner allowed by the law of the state in which the district court in which the federal case is filed is located. Service on the registered agent for service of process is provided by Texas law. In addition, Soluta may be served with process, pursuant to Rule (4)(h)(B), by delivering a copy of the summons and this complaint to an officer, or a managing or general agent, of Soluta, wherever any such person may be found.  Therefore, Soluta may be served with process by delivering a copy of the summons and this complaint to its Treasurer, Robert Lindauer, or its President and Director, Nyle Leftwich, wherever either such person may be found.  Soluta, through its employees, agents, representatives, and/or chief policymakers, acted and/or failed to act at all relevant times, and it is liable for such actions and/or failure to act to the extent allowed by law (including but not

necessarily limited to law applicable to claims pursuant to 42 U.S.C. § 1983). Soluta acted at all times under color of state law, and its policies, practices, and/or customs were moving forces behind and caused constitutional violations, and resulting damages and death, referenced and/or asserted in this pleading.

6.      Defendant Adeola C. Adesomi (sometimes referred to herein as "Ms. Adesomi" or "Nurse Adesomi") is a natural person who resides, is domiciled, and may be served with process at 2326 Shadybrook Rd., Midland, Texas  79705.  Ms. Adesomi may also be served with process wherever she may be found or, pursuant to Federal Rule of Civil Procedure 4(e), by leaving a copy of this complaint and a summons directed to Ms. Adesomi at Ms. Adesomi's dwelling or usual place of abode with someone of suitable age and discretion who resides there.  Ms. Adesomi is being sued in her individual capacity, and she acted at all relevant times under color of state law. Her actions and inaction were moving forces behind, caused, and proximately caused constitutional violations and resulting damages and death referenced in this pleading.  Ms. Adesomi was employed by Soluta at all such times and acted or failed to act in the course and scope of her duties for Soluta.  Ms. Adesomi was also acting at the behest of, as the agent of, and in the course and scope of her duties for Midland County as a result of (1) Midland County's inability to delegate its constitutional duties to a third party; and (2) the relationship between Midland County and Soluta referenced and/or described in this complaint.

7.      Defendant Flor Estrada (sometimes referred to herein as "Ms. Estrada" or "Nurse Estrada") is a natural person who resides, is domiciled, and may be served with process at 2708 W. Washington Ave., Midland, Texas  79701.  Ms. Estrada may also be served with process wherever she may be found or, pursuant to Federal Rule of Civil Procedure 4(e), by leaving a copy of this complaint and a summons directed to Ms. Estrada at Ms. Estrada's dwelling or usual place

of abode with someone of suitable age and discretion who resides there.  Ms. Estrada is being sued in her individual capacity, and she acted at all relevant times under color of state law.  Her actions and inaction were moving forces behind, caused, and proximately caused constitutional violations and resulting damages and death referenced in this pleading.  Ms. Estrada was employed by Soluta at all such times and acted or failed to act in the course and scope of her duties for Soluta. Ms. Estrada was also acting at the behest of, as the agent of, and in the course and scope of her duties for Midland County as a result of (1) Midland County's inability to delegate its constitutional duties to a third party; and (2) the relationship between Midland County and Soluta referenced and/or described in this complaint.

8.        Defendant Timothy Gene Forbush, Jr. (sometimes referred to herein as "Mr. Forbush" or "Nurse Forbush") is a natural person who resides, is domiciled, and may be served with process at 2709 Windsor Drive, Odessa, Texas  79762.  Mr. Forbush may also be served with process wherever he may be found or, pursuant to Federal Rule of Civil Procedure 4(e), by leaving a copy of this complaint and a summons directed to Mr. Forbush at Mr. Forbush's dwelling or usual place of abode with someone of suitable age and discretion who resides there.  Mr. Forbush is being sued in his individual capacity, and he acted at all relevant times under color of state law. His actions and inaction were moving forces behind, caused, and proximately caused constitutional violations and resulting damages and death referenced in this pleading.  Mr. Forbush was employed by Soluta at all such times and acted or failed to act in the course and scope of his duties for Soluta.   Mr. Forbush was also acting at the behest of, as the agent of, and in the course and scope of his duties for Midland County as a result of (1) Midland County's inability to delegate its constitutional duties to a third party; and (2) the relationship between Midland County and Soluta referenced and/or described in this complaint.

9.     Defendant Esther Ebele Ihediwa (sometimes referred to herein as "Ms. Ihediwa" or "Nurse Ihediwa") is a natural person who resides, is domiciled, and may be served with process at 5910 Sabine Drive, Midland, Texas  79707.  Ms. Ihediwa may also be served with process wherever she may be found or, pursuant to Federal Rule of Civil Procedure 4(e), by leaving a copy of this complaint and a summons directed to Ms. Ihediwa at Ms. Ihediwa's dwelling or usual place of abode with someone of suitable age and discretion who resides there.  Ms. Ihediwa is being sued in her individual capacity, and she acted at all relevant times under color of state law.  Her actions and inaction were moving forces behind, caused, and proximately caused constitutional violations and resulting damages and death referenced in this pleading.  Ms. Ihediwa was employed by Soluta at all such times and acted or failed to act in the course and scope of her duties for Soluta.  Ms. Ihediwa was also acting at the behest of, as the agent of, and in the course and scope of her duties for Midland County as a result of (1) Midland County's inability to delegate its constitutional duties to a third party; and (2) the relationship between Midland County and Soluta referenced and/or described in this complaint.

10.     Defendant Lilian Kerubo Okeri (sometimes referred to herein as "Ms. Okeri" or "Nurse Okeri") is a natural person who resides, is domiciled, and may be served with process at 702 W. 18th Street, Big Spring, Texas  79720.  Ms. Okeri may also be served with process wherever she may be found or, pursuant to Federal Rule of Civil Procedure 4(e), by leaving a copy of this complaint and a summons directed to Ms. Okeri at Ms. Okeri's dwelling or usual place of abode with someone of suitable age and discretion who resides there.  Ms. Okeri is being sued in her individual capacity, and she acted at all relevant times under color of state law.  Her actions and inaction were moving forces behind, caused, and proximately caused constitutional violations and resulting damages and death referenced in this pleading.  Ms. Okeri was employed by Soluta at all

such times and acted or failed to act in the course and scope of her duties for Soluta.  Ms. Okeri was also acting at the behest of, as the agent of, and in the course and scope of her duties for Midland County as a result of (1) Midland County's inability to delegate its constitutional duties to a third party; and (2) the relationship between Midland County and Soluta referenced and/or described in this complaint.

11.     Defendant Kelly V. Robins (sometimes referred to herein as "Ms. Robins" or "Nurse Robins") is a natural person who resides, is domiciled, and may be served with process at 1309 E. 44th Street, Odessa, Texas  79762.  Ms. Robins may also be served with process wherever she may be found or, pursuant to Federal Rule of Civil Procedure 4(e), by leaving a copy of this complaint and a summons directed to Ms. Robins at Ms. Robins's dwelling or usual place of abode with someone of suitable age and discretion who resides there.  Ms. Robins is being sued in her individual capacity, and she acted at all relevant times under color of state law.  Her actions and inaction were moving forces behind, caused, and proximately caused constitutional violations and resulting damages and death referenced in this pleading.  Ms. Robins was employed by Soluta at all such times and acted or failed to act in the course and scope of her duties for Soluta.  Ms. Robins was also acting at the behest of, as the agent of, and in the course and scope of her duties for Midland County as a result of (1) Midland County's inability to delegate its constitutional duties to a third party; and (2) the relationship between Midland County and Soluta referenced and/or described in this complaint.  Natural person Defendants Adeola C. Adesomi, Flor Estrada, Timothy Gene Forbush, Jr., Esther Ebele Ihediwa, Lilian Kerubo Okeri, Kelly V. Robins, and Daniel T. Stickel are collectively referred to in this complaint as the "Individual Defendants."

12.     Defendant Daniel T. Stickel (sometimes referred to herein as "Mr. Stickel" or "Jailer Stickel") is a natural person who resides, is domiciled, and may be served with process at

6803 Big Bend Country, Midland, Texas 79705.  Mr. Stickel may also be served with process at his place of employment, Midland County Sheriff's Office, 400 S. Main Street, Midland, Texas 79701.  Mr. Stickel may also be served with process wherever he may be found or, pursuant to Federal Rule of Civil Procedure 4(e), by leaving a copy of this complaint and a summons directed to Mr. Stickel at Mr. Stickel's dwelling or usual place of abode with someone of suitable age and discretion who resides there.  Mr. Stickel is being sued in his individual capacity, and he acted at all relevant times under color of state law.  His actions and inaction were moving forces behind, caused, and proximately caused constitutional violations and resulting damages and/or death referenced in this pleading.  Mr. Stickel was employed by Midland County at all such times and acted or failed to act in the course and scope of his duties for Midland County.

B.     Jurisdiction and Venue

13.     The court has original subject matter jurisdiction over this lawsuit according to 28 U.S.C. § 1331 and 1343(4), because this suit presents a federal question and seeks relief pursuant to federal statute(s) providing for the protection of civil rights.  This suit arises under the United States Constitution and 42 U.S.C. § 1983.  The court has personal jurisdiction over Midland County because it is a Texas county.  The court has personal jurisdiction over Soluta because it regularly conducts business in Texas and the Western District of Texas, Midland-Odessa Division, in a manner in which it would be expected to be hailed into federal court in the Midland-Odessa Division of the Western District of Texas, and moreover because its minimum contacts with the State of Texas, the Western District of Texas, and specifically the Midland-Odessa Division, are such that fundamental fairness would result in such jurisdiction.  The court has personal jurisdiction over all natural person Defendants because they reside and are domiciled in, and are citizens of, Texas.

14. Venue is proper in the Midland-Odessa Division of the United States District Court for the Western District of Texas, pursuant to 28 U.S.C. § 1391(b)(2). A substantial part of the events or omissions giving rise to claims in this lawsuit occurred in Midland County, which is in the Midland-Odessa division of the United States District Court for the Western District of Texas.

II.     Factual Allegations

A.     Introduction

15. Plaintiffs provide in factual allegations sections below the general substance of certain factual allegations. Plaintiffs do not intend that those sections provide in detail, or necessarily in chronological order, any or all allegations. Rather, Plaintiffs intend that those sections provide Defendants sufficient fair notice of the general nature and substance of Plaintiffs' allegations, and further demonstrate that Plaintiffs' claim(s) have facial plausibility. Whenever Plaintiffs plead factual allegations "upon information and belief," Plaintiffs are pleading that the specified factual contentions have evidentiary support or will likely have evidentiary support after a reasonable opportunity for further investigation or discovery. Moreover, where Plaintiffs quote a document, conversation, or recording verbatim, Plaintiffs have done Plaintiffs' best to do so accurately and without any typographical errors.

B.     Savion Vashon Hall.

16. Savion Vashon Hall was born in 1989 and suffered an untimely and unnecessary death at the age of 30, on July 19, 2019. Savion was born and attended Lee High School in Midland, Texas. He was survived by his mother, stepfather, daughters, sister, brother, and a number of other friends and relatives.

C.     Savion's Death Resulting from Deliberate Indifference in the Midland County Jail

17.     Savion suffered a tragic, completely preventable death as a result of what happened to him in the Midland County jail.  Individual Defendants' and Mr. Stickel's deliberate indifference and objective unreasonableness in their actions and inaction, and Midland County's and Soluta's policies, practices, and/or customs, caused, were proximate causes of, and were producing causes of Savion's suffering and/or death, and all other damages referenced in this pleading.

18.     Savion was arrested and taken to the Midland County jail on June 21, 2019.  As part of the intake process, a jailer completed the Screening Form for Suicide and Medical/Mental Developmental Impairments.  The Texas Commission on Jail Standards requires that county jails complete this form for every inmate at the time of intake.  The jailer completing the form for Savion, in answer to the question "Serious injury/hospitalization in the last 90 days?," checked the "Yes" box.  Next to the response was handwritten "06/20/19 due to breathing problem."  The form also indicated that Savion was prescribed Prednisone and had a chronic illness, although that illness was not listed in response to the prompt "describe."  The medical intake form indicated that Savion had asthma and suffered from shortness of breath.  Savion's oxygen saturation level was listed at 99% at intake.  His blood pressure showed to be 127/74 at intake.  A progress note for the time of intake, with Soluta's name pre-printed at the top of the form, indicates that Savion's vital signs were within normal limits.  That would soon change as a result of Defendants' actions and inaction.

19.     Savion would ultimately be incarcerated for a period of time, and unfortunately would leave the jail in a condition resulting in his death.  Savion was apparently transported to the Midland Memorial Hospital Emergency Department on or about July 1, 2019 for issues related to his asthma.  Discharge instructions included the instruction that Savion return to the emergency

department for further evaluation if his symptoms worsened. Unfortunately, Individual Defendants did not seek EMS regardless of Savion's worsening condition over the following days. Nurse Forbush wrote on July 9, 2019 that Savion needed a lower bunk due to his medical diagnosis for asthma. Further details regarding Savion's stay, and his ultimate death as a result of Defendants' objective unreasonableness and deliberate indifference, are provided below.

D.      Witnesses

20.    Plaintiffs provide in this section, as above, information at times obtained from statements given, information provided, and/or reports drafted by certain people. Information obtained from these statements and/or reports may be inconsistent at times, and conflict with information in statements and other reports of persons referenced in this pleading. However, indulging all inferences in Plaintiffs' favor, even when there are inconsistencies or differences, which Plaintiffs may note only at times. Plaintiffs state plausible claims for deliberate indifference and/or objective unreasonableness of Individual Defendants and Mr. Stickel, and for *Monell* claims against the County and Soluta.

1.      Adesomi, Adeola C. - Nurse

21.     Upon information and belief, Nurse Adesomi earned in year 2013 a bachelor's degree in nursing. She thereafter obtained a license through the Texas Board of Nursing to act as a registered nurse. She was also licensed to act as a nurse, upon information and belief, in another state before being licensed in Texas. Upon information and belief, she was a licensed nurse at the time she interacted with Savion, during the period referenced in this pleading, in the Midland County jail.

22.     Upon information and belief, Ms. Adesomi intentionally falsified, and moreover decided to ignore and contribute to the material and serious inaccuracy of, Savion's medical records while he was incarcerated in the Midland County jail.  This resulted in the inability of one or more other healthcare professionals, including upon information and belief at least one physician, to provide any care at all to Savion.  Ms. Adesomi's decision to act in such a deliberately indifferent and objectively unreasonable manner was not mere medical negligence, and Plaintiffs do not allege a mere medical negligence claim.  Rather, Ms. Adesomi did not provide, upon information and belief, treatment and/or evaluation documented in Savion's medical records.  Upon information and belief, Ms. Adesomi indicated that she in fact performed treatment and/or made assessments of Savion, related to his serious medical needs arising from significant breathing problems, which she did not perform.  This decision resulted in Savion's suffering over a number of days in the Midland County jail, ultimately ending with his death.

23.     Ranger Gray on or about February 12, 2019, interviewed Nurse Deborah Dunson and Nurse Adesomi at the same time.  Ranger Gray asked questions to confirm signatures and numbers referring to Soluta employees, and which were listed on a small volume nebulizer ("SVN") treatment flowsheet for Savion for purported treatment and assessment of Savion while in the Midland County jail, as well as possibly other documents.  Ms. Adesomi referenced number 629 for herself, and number 621 for Kayla Robbins.  When reviewing signatures on the sheet, Nurse Adesomi and/or Nurse Dunson referenced Ms. Adesomi, Ms. Robbins, Esther, and Lillyann.

## SVN Treatment Flo-Sheet

Start Date: 6/21/19　　End Date: Release　　Order: Albuterol Q4 hrs
　　　　　　　　　　　　　　　　　　Must write order in chart.　— PRN —

| Date: | Time | O₂ Sats | | Breath Sounds | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | PRE | POST | BBS Per SVN | BBS Post SVN | Signature |
| 6/21/19 | 1600 | 98% | 100 | Wheezing SOB | clear | [signature] |
| 6.24.19 | 0550 | 97% | 98% | wheezing | Improved | M drine |
| 6/25 | 0550 | 96% | 93% | wheezing | clear | |
| 6.25/19 | 0500 | 97% | 97% | wheezing | Improved | T Lesner |
| 6.28/19 | 0100 | 96% | 97% | wheezing/coughing | Improved | [signature] |
| 6/29/19 | 1800 | 97% | 90% | wheezing | Improved | [signature] |
| 6/29/19 | 2230 | 98% | 97% | wheeze | Improved | A Adesanmi |
| 6/30/19 | 0542 | 96% | 99% | wheezing | Improved | [signature] |
| 7/1/19 | 0348 | 96% | 99% | Lower lobes wheeze | Improved | [signature] |
| 7-1-19 | 2235 | 96% | 97% | wheezing | Improved | [signature] |
| 7.3.19 | 2000 | 94% | 97% | wheezing | Improved | V Clarista |
| 7/3/19 | 2215 | 95% | 98% | Wheezing cough | | [signature] RN |
| 7/6/19 | 0110 | 96% | | | | |
| 7/4/19 | 2226 | 96% | 99% | wheezing | Improved | [signature] |
| 7/6/19 | 0550 | 95% | 98% | wheezing | Improved | [signature] |
| 7-7-19 | 2100 | 96% | 98% | wheezing | Improved | V Clarista |
| 7.8.19 | 2138 | 96% | 97% | coughing wheezing | Improved | Mosro |
| 7/9/19 | 2008 | 97% | 99 | wheezing | Improved | [signature] |
| 7.9.19 | 2310 | 97% | 97% | wheezing | Improved | V Clarista |
| 7-10-19 | 0400 | 96% | 97% | wheezing | Improved | [signature] |
| 7/11/19 | 0000 | 97% | 98% | wheezing | Improved | [signature] |
| 7/11/19 | 0440 | 98% | 98% | wheezing | Improved | [signature] |
| 7/11/19 | 0720 | 97 | 98 | wheezing | NOT improved | Allen — MD/NP RT |

NAME: HALL, SAVION VASHON
DOB: ▓▓▓▓▓▓
Name Number: 288075

24.     Ranger Gray asked Nurse Adesomi what "SVN" stood for.  Amazingly, Nurse Adesomi said, "I don't know off-hand."  Nurse Dunson also said, "I don't know."

25.     Ranger Gray asked Ms. Dunson to describe to him how the medical record sheet for breathing treatments (SVN Treatment Flowsheet) would be completed for Savion.  The following discussion occurred.

| | |
|---|---|
| Ranger: | So describe to me, I'll start with you first. We'll do it separate, because we're right here.  But, Deborah, describe to me the pre and post and all these things. What would you do to fill out... Go step-by-step along the line. What would you be doing in real life? You had me right here and you're going to give me the treatment, describe what you [crosstalk] would be doing. |
| Deborah: | Put the date and the time and then the [O2 stats]. We do that before the breathing treatment, and then the post. Pre is before, post is after. And then how they sounded before the breathing treatment, after the breathing treatment, and our signature. |
| Ranger: | And you sign it, okay. So when you're doing the breath sounds, would you be using a [crosstalk] stethoscope? So you'd be listening. And then the O2. What would that involve? Would that be- |
| Deborah: | O's an oximeter. |
| Ranger: | That's a little thing, you see around [inaudible] the fingers. Okay. So in order to get these numbers, [crosstalk] you'd have to put it on the finger, because otherwise, you wouldn't know, unless you're just, "He looks like a 95." [crosstalk] Yeah, that wouldn't be good, right? And then you have to, before when you're listening to the lungs, I'm guessing right here in the middle then, the treatment [crosstalk] would happen and then you would listen afterwards to see... |
| Deborah: | Yes. |
| Ranger: | Okay. And Adel, is that how you understand it as well, Adel? |
| Adel: | Yes. |

26.     Ms. Dunson also explained in general what a small volume nebulizer was.  She said that there was a machine, which nurses would give to Savion, and then turn it on.  They would then let him breathe by himself once the machine was on.  They would allegedly check, or assess, Savion after the breathing treatment completed.  Ms. Dunson said it took 10 to 15 minutes for such a breathing treatment.

27.     Ranger Gray asked Ms. Dunson whether there was anything that stood out to her or was abnormal with Savion.  She responded, "He's always short of breath."  She also said, "He always, every time he came in, we had to give him breathing treatment."  She also said that there should not have been any time when he was provided a breathing treatment and which was not recorded on the SVN Treatment Flowsheet.

28.     Ms. Dunson repeated at least twice more that every time Savion came to the nurses' station, he received breathing treatments.  Nurse Adesomi admitted that she know that Savion was a severe asthmatic.  She also admitted that she knew that someone with such a condition, if he is "really constricted," would have a low oxygen saturation level.  Thus, she was aware of the extreme importance of actually taking oxygen saturation readings as opposed to merely making up numbers and writing them into the medical record.  Nurse Adesomi also admitted that, if, by way of example, Savion's oxygen saturation dropped from 98% to 87%, he would need oxygen.

29.     Ms. Dunson said that Savion was short of breath on the day he was removed from the jail (July 11, 2019) for the hospitalization that concluded in his death, so EMS was called.  She admitted that Doctor Willingham was also at the jail that day.  Ms. Adesomi, attempting to defend herself, launched into narratives designed to divert Ranger Gray's attention from Nurse Adesomi. Ranger Gray finally asked the two women whether the SVN Treatment Flowsheet was going to be completely correct: "This is all going to match up with the treatments that were given and the

oxygen levels that were recorded and everything else.  This is going to be what was done?"  Ms. Adesomi responded, "Yes."  Ms. Dunston responded, "Should be."  Upon information and belief, they both knew that such assertions were false.

### 2.    Estrada, Flor – Nurse

30.     Upon information and belief, Ms. Estrada graduated from nursing school in August 2018.  She thereafter obtained a license through the Texas Board of Nursing to act as a vocational nurse.  Upon information and belief, she was a licensed nurse at the time she interacted with Savion, during the period referenced in this pleading, in the Midland County jail.

31.    Ms. Estrada intentionally falsified, and moreover decided to ignore and contribute to the material and serious inaccuracy of, Savion's medical records while he was incarcerated in the Midland County jail.  This resulted in the inability of one or more other healthcare professionals, including upon information and belief at least one physician, to provide any care at all to Savion.  Ms. Estrada's decision to act in such a deliberately indifferent and objectively unreasonable manner was not mere medical negligence, and Plaintiffs do not allege a mere medical negligence claim.  Rather, Ms. Estrada did not provide, upon information and belief, treatment and/or evaluation documented in Savion's medical records.  Upon information and belief, Ms. Estrada indicated that she in fact performed treatment and/or made assessments of Savion, related to his serious medical needs arising from significant breathing problems, which she did not perform.  This decision resulted in Savion's suffering over a number of days in the Midland County jail, ultimately ending with his death.

32.    Ms. Estrada provided a statement, on or about December 17, 2019, to Ranger Gray.  Ranger Gray asked Ms. Estrada about the SVN Treatment Flowsheet for Savion.  Nurse Estrada

confirmed that Savion's main treatment for asthma, while in the Midland County jail, was through

use of a small volume nebulizer.  She also confirmed that the SVN Treatment Flowsheet should

record that treatment.  Nurse Estrada told Ranger Gray that "BBS" on the sheet is an acronym for

"bronchial breath sounds."  When asked whether a nurse could listen to bronchial breath sounds

with the nurse's ears alone, nurse Estrada responded, "No.  You have to use a stethoscope."  Nurse

Estrada also told Ranger Gray that, to check Savion's oxygen saturation, "You can use a saturation

. . . O2 saturation monitor.  You can use it on their finger."

33.    Ranger Gray then asked a series of questions, and obtained responses, regarding

what a person would expect to see if watching a video recording of SVN treatments like those

allegedly given to Savion.

| | |
|---|---|
| Ranger: | Okay. So, on the sheet, I was looking at it on the SVN sheet. It says O2 and it says like 97%, and then O2 after it's like 98%. And the breathing, it says wheezing, then after it says clear or better, improved. |
| Flora Estrada: | Yes, sir. |
| Ranger: | So on that, what would I expect to see if I were to pull the video then and go back and see each of those things? And I stayed this time, the nurse comes in and you're looking at 96%. How would she get to that? |
| Flora Estrada: | To recheck their O2 saturation? |
| Ranger: | Yeah. You'd walk over and you'd see them put a thing on the finger? |
| Flora Estrada: | Mm-hmm (affirmative). |
| Ranger: | And then you get a stethoscope and listen to the back of the lungs, from the lungs, all kinds of stuff like that? |
| Flora Estrada: | Yes. And you can also ask the patient if he feels any better, if he's noticed improvement. |
| Ranger: | And then after all the treatments and stuff, you listen again to see if everything is sounding better? |

Flora Estrada: Yes.

Ranger:        Okay. Then the O2 afterwards, you do that last to see if it's come up
               or it's improved?

Flora Estrada: Mm-hmm. You can do either/or.

Ranger:        Okay. Okay. If I'm looking at that sheet correctly and I would go
               back now and look at videos and it says O2, 97% then after O2, 98%.
               The nurse would have to be sitting there putting that thing on his
               finger. Right?

Flora Estrada: Correct.

Ranger:        And there's no way to just look at him and be, "you're 97%."

For a Estrada: No.

                              *        *        *

Interviewer:   Okay. When I looked through the SVN sheet and I see signed Flora
               Estrada,
               everything that you wrote in there it's going to be correct?

Flora Estrada: Yes.

34.    Nurse Estrada was accurately describing in general the manner in which a breathing
treatment should have been provided to Savion.  However, upon information and belief, she was
untruthful when telling Ranger Gray that she actually performed actions which would have been
recorded on the SVN sheet.  Upon information and belief, she falsified records indicating that
certain occurrences, such as oxygen saturation checks through use of a pulse oximeter, or checking
of bronchial breath sounds through use of a stethoscope, occurred.  She explicitly and implicitly
confirmed what all Individual Defendants knew – no one could determine Savion's oxygen
saturation level except through use of a pulse oximeter, and no one could listen to Savion's
bronchial breath sounds except through use of a stethoscope.

3.      Forbush, Jr., Timothy Gene – Nurse

35.      Upon information and belief, Mr. Forbush graduated from nursing school in 2011. He thereafter obtained a license through the Texas Board of Nursing to act as a vocational nurse. Upon information and belief, he was a licensed nurse at the time he interacted with Savion, during the period referenced in this pleading, in the Midland County jail.

36.      Upon information and belief, Nurse Forbush intentionally falsified, and moreover decided to ignore and contribute to the material and serious inaccuracy of, Savion's medical records while he was incarcerated in the Midland County jail. This resulted in the inability of one or more other healthcare professionals, including upon information and belief at least one physician, to provide any care at all to Savion. Mr. Forbush's decision to act in such a deliberately indifferent and objectively unreasonable manner was not mere medical negligence, and Plaintiffs do not allege a mere medical negligence claim. Rather, Mr. Forbush did not provide, upon information and belief, treatment and/or evaluation documented in Savion's medical records. Upon information and belief, Mr. Forbush indicated that he in fact performed treatment and/or made assessments of Savion, related to his serious medical needs arising from significant breathing problems, which he did not perform. This decision resulted in Savion's suffering over a number of days in the Midland County jail, ultimately ending with his death.

37.      Nurse Forbush provided a statement on or about December 12, 2019 to Ranger Gray. Mr. Forbush feigned surprise at Savion's death being ruled an in-jail death. He said that Savion was alive at the jail. Mr. Forbush knew that this was a distinction without a difference. Savion died as a result of what happened in the jail. It makes little difference to say that Savion died at a hospital as a result of what happened at the jail.

38.     Ranger Gray reviewed the SVN Treatment Flowsheet with Nurse Forbush.  Nurse Forbush admitted that his signature was on the SVN Treatment Flowsheet.

39.     Nurse Forbush said that he would see Savion in "doctor sick call."  He said that Savion had an inhaler, but that he would at times need Prednisone due to his breathing issues. Nurse Forbush said that would "open you up."  Nurse Forbush was indicating that the medication would significantly help a person with breathing difficulties.  Nurse Forbush described what should have been the usual and customary procedure at the Midland County jail for providing such breathing treatments, and also some of what he knew about Savion and asthma.

| | |
|---|---|
| Timothy Forbush: | I've had asthma since I was a kid, but it's not that bad. |
| Ranger: | Right. |
| Timothy Forbush: | It's when I smoke. |
| Ranger: | Yeah, yeah. |
| Timothy Forbush: | But he was a severe asthmatic. So every time he needed to come down to get a breathing treatment... I mean usually, he was pretty good. Like anything above 90 is good. This one was not. |
| Ranger: | Yeah. Yeah. That was the last day. |

40.     Nurse Forbush evidenced his knowledge of asthma, even from personal experience. He also admitted that Savion was a "severe asthmatic."  Thus, every time Savion ended up at the nurses' station, he needed a breathing treatment.  When he referenced that one oxygen saturation level was not good, upon information and belief, he was referencing the July 11, 2019 removal of Savion from the Midland County jail – for the last time – and which concluded in this death.

| | |
|---|---|
| Timothy Forbush: | Right. So, all these, I mean, these are normal. It's about what I said at, 96, 98- |
| Ranger: | Yeah. |

| | |
|---|---|
| Timothy Forbush: | After, we checked their O2 set again, so it would 100, 97, 99. So he would always improve. He would always have a lot of wheezing. |
| Ranger: | Yeah. |

41.     Upon information and belief, Nurse Forbush was lying about Savion improving.  In fact, upon information and belief, Nurse Forbush participated in, and knew that others participated in, falsifying the SVN Treatment Flowsheet for Savion.  Thus, Savion was not in fact improving. Individual Defendants made it look like Savion improved after breathing treatments by falsifying the SVN Treatment Flowsheet.

| | |
|---|---|
| Timothy Forbush: | I know when he was at the jail, he was in the outside blocks. |
| Ranger: | Right. |
| Timothy Forbush: | It's like G, H, and J. Like I always kept asking the sergeant to move him closer to us, so he wouldn't have to walk so far- |
| Ranger: | Right. Right. |
| Timothy Forbush: | … to get a breathing treatment. |
| Ranger: | Yeah. |
| Timothy Forbush: | So he'd be closer, but that never happened. |

42.     Midland County and Soluta policy, practice, and/or custom as to inmates such as Savion, who clearly needed medical treatment for serious health issues, was to house them too far away from the treatment area.  Nurse Forbush indicated that he asked that Savion be moved closer to the treatment area, but no action occurred.  Upon information and belief, this request was made to a Midland County Sheriff's Department sergeant.

| | |
|---|---|
| Ranger: | So, explain to me what's going on right here, with the date, the time, and what you would be doing. So, if I were to be sitting there... like go back in time, and then I'm sitting in that doctor's area |

Timothy Forbush:    Mm-hmm (affirmative).

Ranger:    ... and he comes in, does whatever. Then explain to me, step by step, what you're doing, and then what you're writing down right here as you're doing it.

Timothy Forbush:    So, you're going to come in. We slap a little thing on their finger.

Ranger:    On their finger?

Timothy Forbush:    Right.

Ranger:    A little O2 meter, right?

Timothy Forbush:    Right. Check their O2 set. And then, we do that before the treatment and after the treatment; check their lung sounds before and after.

Ranger: Right.    So when you're checking the sounds of the lungs, you're going to use like a-

Timothy Forbush:    Stethoscope.

Ranger:    ... stethoscope and everything?

Timothy Forbush:    Right.

Ranger:    So, it says right here on that date, that time that you did the O2 on his finger and it's 96?

Dispatch:    [crosstalk] 13-02, Phillip.

Timothy Forbush:    Right.

Ranger:    Afterwards, it was 99. He was wheezing, and then he was clear, afterwards?

Dispatch:    46, 13-02.

Timothy Forbush:    Right.

Ranger:    All right.

Dispatch:    Yes, ma'am. I have a K-9 in route to my location-

| Ranger: | And that's the usual procedure, and everyone's doing it? |
|---|---|
| Dispatch: | ... and I'll be 10-6. |
| Timothy Forbush: | Yes. |

43.     Nurse Forbush described generally what should have occurred had Individual Defendants been providing medical treatment and/or assessment as indicated in the SVN Treatment Flowsheet.  However, Upon information and belief, Nurse Forbush knew that oxygen saturation readings were not taken through use of a pulse oximeter, and that breath sounds were not assessed through use of a stethoscope, even though the SVN Treatment Flowsheet indicated that such activities occurred with regard to Savion.  This is no assessment and/or treatment at all. It is not a disagreement about the quality of treatment provided.

| Timothy Forbush: | And I talked to the EMS a couple of times, that they picked him up or whatever.  I know a bunch of the nursing staff did too. Like he would wait till he was damn near dead to call 911. |
|---|---|
| Ranger: | Right. |
| Timothy Forbush: | So, I mean, he was the type of person, like he would always wait until the last minute to tell somebody that he couldn't breath. |
| Ranger: | Right. |
| Timothy Forbush: | So that was an issue. |
| Ranger: | Yeah. |

44.     Nurse Forbush was untruthful regarding Savion being the person to blame for not receiving his treatment.  Since Individual Defendants, and potentially others, falsified records and did not provide treatment and/or assessment as indicated, it was they who caused Savion serious health problems, pain, suffering, need for additional treatments, and death.  Savion was in their custody, and they thus owed constitutional duties to him.

Ranger:              Yeah. All right. I'm trying to think of anything else I might
                     have missed, though.  What about the usual procedure for
                     looking after patients. Like when you go through all your
                     schools and everything else-

Timothy Forbush:  Mm-hmm (affirmative).

Ranger:              ... is there like a hierarchy of like care and stuff? Is there like...
                     because I talked to one nurse, and she was saying something
                     like, "You do like evaluate treatment, and then reevaluate-

Timothy Forbush:  Right.

Ranger:              It's like the core foundation.

Timothy Forbush:  Right. And then, after that it's like A, B, C, so airway,
                     breathing, circulation.

Ranger:              Right.

Timothy Forbush:  You always want to make sure they can breathe, how their
                     airway is, and then their circulation, like if they're moving air,
                     if their blood pressure, their pulse is good? Stuff like that.

Ranger:              Yeah. And then this paperwork right here is a kind of... What
                     is it used for?

Timothy Forbush:  This is just for as-needed breathing treatments.

45.     Nurse Forbush, like other Individual Defendants, had received medical training,
and had medical experience, such that they knew the most basic important things to ensure for any
patient.  Nurse Forbush, and all other Individual Defendants, knew that airway and breathing were
the two most important things to address in situations like that at issue in this case.  Thus, all
Individual Defendants knew their decision to not properly treat, assess, and document purported
treatments of Savion could and would lead to serious injury, suffering, and/or death.

Timothy Forbush:   I know, I mean it was every time that he came to medical, it
                     was kind of the same thing. It was just like he couldn't breathe
                     or whatever. We'd give him breathing treatments of whatever.
                     And he had the hand inhaler, and I mean, whenever it got really
                     bad? Like when he sounded really cruddy?

| | |
|---|---|
| Ranger: | Yeah. |
| Timothy Forbush: | Then we'd put him in to see the doctor. Then the doctor would see him, give him a round of antibiotics, or prednisone, or a Z-Pak, or something to help him kind of get his body moving air again. |
| Ranger: | All right. So this document right here is basically like over time, it looks like he's decent then? |
| Timothy Forbush: | Right. I mean, it's all pretty much almost always the same. |
| Ranger: | Okay. |
| Timothy Forbush: | The only one that wasn't was that one- |
| Ranger: | Is the last one is really bad, then. Yeah. |
| Timothy Forbush: | Because anything under 90, it was like, "You're not moving air. Your body is not producing oxygen like it should- |

46.     Nurse Forbush once again attempted to deflect liability from himself by launching into a skewed and false narrative indicating that Nurse Forbush cared enough about Savion to properly assess, treat, and document any treatment.  He again confirmed Savion's issue continuous over time – the inability to breath.  Upon information and belief, Nurse Forbush's implicit reference to several visits to a doctor was untrue.  Notably, Nurse Forbush confirmed what Ranger Gray said regarding the SNV Treatment Flowsheet: "So this document right here is basically like over time.  It looks like he is decent then?"  Ranger Gray confirmed that Individual Defendants, in falsifying medical records, made it appear to anyone reviewing those records, such as Doctor Willingham, that Savion was doing well with his treatments.  Instead, falsification of records, and failure to take oxygen saturation levels, and conduct bronchial breath sound assessments, were in actuality killing Savion.

47.     Ranger Gray reviewed with Nurse Forbush the area in which Savion received medical treatment.  Nurse Forbush confirmed in substance that video recordings at issue in this case would show the area in which Savion would have received any breathing treatments.  Ranger Gray thus proved that Defendants could not allege that Savion was somehow having his oxygen saturation level, and/or bronchial breath sounds, checked at a location not recorded by the jail camera recording system.

48.     Nurse Forbush also admitted that, at times, if a nurse did not complete a portion of the SVN Treatment Flowsheet, the nurse would "go back and fill it out."  He said that nurses would sometimes "get caught up,"  even though they were "[n]ot supposed to."  Thus, he admitted that documentation was made in medical records well after a medical event.

49.     Nurse Forbush also admitted that the jail was understaffed:

| Timothy Forbush: | Honestly? I mean there's so much that we do there at the jail, it's kind of like organized chaos, sometimes? |
|---|---|
| Ranger: | Yeah, I bet. Yeah, all those guys coming in and out. All hours of the night and day, and everything. |
| Timothy Forbush: | And then the guards call you 24/7 that, "So and so needs this," or "So and so needs that." And you have the sick calls, and you have captains and lieutenants, and they want people seen, and then our boss. And so, I mean it's- |

50.     Nurse Forbush also said that all the nurses at the jail worked hard to obtain their nursing licenses.  He admitted in the same discussion that he was nervous about Savion's death. He said that it "kind of puts like a dark cloud over everyone's head."  Nurse Forbush said that his boss looks to him as her go-to-guy for everything, following that statement by saying, "Of course, I'm the only male that works there."  Thus, it appears that Midland County and/or Soluta prioritized gender over competency.

51.     Nurse Forbush also supported other allegations in this pleading regarding Soluta being a for-profit entity, operating in the marketplace competing for business with other providers of healthcare in jails and correctional facilities:

Timothy Forbush:     Well I mean, I always have the... the main thing I always argue with the lieutenants over billing and payments.

Ranger:     Yeah, yeah. Okay.

Timothy Forbush:     Because we get people that come back from the hospital, they have a referral, they need to go see a cardiologist, or a gastroenterologist, or a outside doctor.

Ranger:     Yeah.

Timothy Forbush:     And then we have to pay those outside doctors to see our inmates because we don't have the equipment necessary to take care of them longterm.

Ranger:     Right.

Timothy Forbush:     So then they need their followups, checkups and stuff, and then they complain, "Oh, well we don't have to pay for that, they're in jail. And blah, blah, blah." And I'm like, "Regardless, it's the care of a human being. This is our job to take care of so and so while they're in our custody, because that's why we're here. That's why you've hired us."

52.     It was unfortunate that Nurse Forbush referred to "human being[s]" in the jail, when Savion had been treated the way he was in the jail.  Regardless, Mr. Forbush's comments showed that Midland County, and Soluta, tried to save money by not providing needed medical treatment to Midland County detainees.

53.     The interview of Nurse Forbush ended with Nurse Forbush's description of the significant risk to Savion's health, of which Nurse Forbush was aware:

Timothy Forbush:     I mean, even then, at 87, 88%? I mean I can tell you he was a severe asthmatic.  Okay?

Ranger:     Yeah.

| Timothy Forbush: | So, severe asthmatics, they get bronchospasms sometimes, which means that your lungs are trying to fill up with air, but they can't really fill up air. You can't move it. So then your lungs like dilate. |
|---|---|
| Ranger: | Right. |
| Timothy Forbush: | So then, that's why you can't move air, because they're doing this, when they should be doing this. |
| Ranger: | Right. |
| Timothy Forbush: | But even at 87, 88, and he's still moving quite a bit of air. So, I don't understand what happened. Like I'm not a doctor. |
| Ranger: | Yeah. |
| Timothy Forbush: | But even at that? We should have been able to bring him... give him a couple of breathing treatments. |
| Ranger: | Get oxygen in him and- |
| Timothy Forbush: | Right. |
| Ranger: | Yeah. |
| Timothy Forbush: | I don't know what happened. I mean, for the most part? He was always like I said, the same. |

54.     Once again, Nurse Forbush attempted to deflect responsibility from himself and other Individual Defendants.  Upon information and belief, he knew that Savion was not the same all the time.  In fact, he knew that Savion's medical records were falsified to reflect medical conditions in Savion other than those which existed.  Savion suffered over a lengthy period of time in the Midland County jail, and that suffering, and failure to assess him and/or provide medical treatment, and/or not to have Savion transferred by EMS to a local hospital emergency department, caused his death.

4.     Ihediwa, Esther Ebele – Nurse

55.     Upon information and belief, Ms. Ihediwa graduated from nursing school in 2015. She thereafter obtained a license through the Texas Board of Nursing to act as a registered nurse. Upon information and belief, she was a licensed nurse at the time she interacted with Savion, during the period referenced in this pleading, in the Midland County jail.

56.     Upon information and belief, Ms. Ihediwa intentionally falsified, and moreover decided to ignore and contribute to the material and serious inaccuracy of, Savion's medical records while he was incarcerated in the Midland County jail.  This resulted in the inability of one or more other healthcare professionals, including upon information and belief at least one physician, to provide any care at all to Savion.  Ms. Ihediwa's decision to act in such a deliberately indifferent and objectively unreasonable manner was not mere medical negligence, and Plaintiffs do not allege a mere medical negligence claim.    Rather, Ms. Ihediwa did not provide, upon information and belief, treatment and/or evaluation documented in Savion's medical records. Upon information and belief, Ms. Ihediwa indicated that she in fact performed treatment and/or made assessments of Savion, related to his serious medical needs arising from significant breathing problems, which she did not perform.  This decision resulted in Savion's suffering over a number of days in the Midland County jail, ultimately ending with his death.

### 5.     Okeri, Lilian Kerubo – Nurse

57.     Upon information and belief, Ms. Okeri graduated from nursing school in January 2017.  She thereafter obtained a license through the Texas Board of Nursing to act as a vocational nurse.  Ms. Okeri thereafter graduated nursing school to become a registered nurse, in December 2019, and became licensed as a registered nurse.  Upon information and belief, she was a licensed

nurse at the time she interacted with Savion, during the period referenced in this pleading, in the Midland County jail.

58.     Upon information and belief, Ms. Okeri intentionally falsified, and moreover decided to ignore and contribute to the material and serious inaccuracy of, Savion's medical records while he was incarcerated in the Midland County jail.  This resulted in the inability of one or more other healthcare professionals, including upon information and belief at least one physician, to provide any care at all to Savion.  Ms. Okeri's decision to act in such a deliberately indifferent and objectively unreasonable manner was not mere medical negligence, and Plaintiffs do not allege a mere medical negligence claim.    Rather, Ms. Okeri did not provide, upon information and belief, treatment and/or evaluation documented in Savion's medical records. Upon information and belief, Ms. Okeri indicated that she in fact performed treatment and/or made assessments of Savion, related to his serious medical needs arising from significant breathing problems, which she did not perform.  This decision resulted in Savion's suffering over a number of days in the Midland County jail, ultimately ending with his death.

59.     Nurse Okeri gave a statement to Texas Ranger Gray on or about February 19, 2020. Ms. Okeri admitted that she was familiar with the correct procedure to provide breathing treatments.  She also said that she recalled signing Savion's medical record regarding provision of breathing treatments.  Nurse Okeri said that she would assess Savion before and after the treatment, and record the assessment.  She alleged that she would write down Savion's oxygen saturation, expressed as a percentage, after determining his oxygen saturation through use of a pulse oximeter placed on Savion's finger.  She also alleged that, when she would write "wheezing unimproved," that would indicate that she listened to Savion's breathing with a stethoscope.  She also said that

the described manner of providing a breathing treatment, and recording critical information, was the way it was done with all patients when she provided a breathing treatment.

60.     Ms. Okeri said, "Yeah, that's what I do.  I use a stethoscope to listen before I give a breathing treatment and after."  Ranger Gray asked Ms. Okeri whether there would be any time that medication would be provided or anything would be done and it would not be written on the medical record for Savion.  Ms. Okeri responded, "Not on my shift."

61.     Upon information and belief, Ms. Okeri was lying to Ranger Gray.   Upon information and belief, Ms. Okeri recorded oxygen saturation percentages in Savion's jail medical record even though she had not used a pulse oximeter to determine those percentages, or in the alternative she participated in and/or knew about such occurrences and allowed and approved of them.  Upon information and belief, she simply made up the numbers.  Further, upon information and belief, she would record information regarding whether Savion was or was not wheezing, even though she had not used a stethoscope.   Upon information and belief, all other Individual Defendants also engaged in action and/or inaction referenced in this paragraph.

### 6.     Robins, Kelly Venell – Nurse

62.     Upon information and belief, Ms. Robins graduated from nursing school in 2001.  She thereafter obtained a license through the Texas Board of Nursing to act as a vocational nurse.  Upon information and belief, she was a licensed nurse at the time she interacted with Savion, during the period referenced in this pleading, in the Midland County jail.

63.     Upon information and belief, Ms. Robins intentionally falsified, and moreover decided to ignore and contribute to the material and serious inaccuracy of, Savion's medical records while he was incarcerated in the Midland County jail.  This resulted in the inability of one or more other healthcare professionals, including upon information and belief at least one

physician, to provide any care at all to Savion.  Ms. Robins' decision to act in such a deliberately indifferent and objectively unreasonable manner was not mere medical negligence, and Plaintiffs do not allege a mere medical negligence claim.  Rather, Ms. Robins did not provide, upon information and belief, treatment and/or evaluation documented in Savion's medical records.  Upon information and belief, Ms. Robins indicated that she in fact performed treatment and/or made assessments of Savion, related to his serious medical needs arising from significant breathing problems, which she did not perform.  This decision resulted in Savion's suffering over a number of days in the Midland County jail, ultimately ending with his death.

### 7.   Stickel, Daniel T. - Jailer

64.   Jailer Stickel provided reports and/or statements related to Savion's death.  Jailer Stickel was operating under merely a temporary jailer's license at the time, meaning, upon information and belief, that he had not received the education, training, and/or testing to act pursuant to a normal jailer's license.  Mr. Stickel's reports and/or statements are provided in the portion of this pleading below addressing an investigation of Savion's death conducted by the Midland County Sheriff's Office.

### 8.   Willingham, David Barry - Physician

65.   Ranger Gray took the statement of Doctor David Barry Willingham on or about August 30, 2019.  Doctor Willingham indicated he was a family practice physician, graduating from medical school in 1985 in San Antonio.  He said that he had a family practice residency at Texas Tech in Odessa.  He also said that he had worked with Soluta in connection with Midland County contracting sick-call medical services to Soluta.

66.   Ranger Gray reviewed the SVN Treatment Flowsheet with Doctor Willingham.

Ranger:                    What I'm going to do right now is I'm going to have you look at the SVN treatment flow sheet, and I'm going to ask you the procedure that a person would go through, or a nurse or a doctor, when administering the medications needed to treat someone's breathing problems. And if I could get you to read across the top of the sheet right there, and then explain to me what all those different pieces mean.

Willingham:               The first one is dated 6/21/19. The time is 16:00, which is 4:00 PM. Under the column pre, it says 98%, which is a measurement of the O2 saturation obtained from the index finger. Post, O2 saturation is listed at 100%. Then the next column is BBS per S... Small volume nebulizers is what SVN stands for. Oh, BBS, bilateral breath sounds. I wasn't sure what that was. But anyway, wheezing and shortness of breath is listed pre. It says per, but I'm sure that means prenebulizer, meaning before the breathing treatment was given. And then breath sounds post-nebulizer treatment are clear. And then there's a signature of the nurse administering the treatment.

Ranger:                    What would be the usual procedure? If you were to have a hypothetical patient sit down in front of you right now, what would you usually do and what would people see you do to a patient?

Willingham:               If they were a known asthmatic or complaining of asthma and communicating that they needed treatment, you would first just look at them generally. Are they any acute respiratory distress or they're bent over breathing fast, having any trouble moving air as they are coming in and out. Then generally, you would listen to their lungs with a stethoscope to see how much wheezing was occurring. Then, of course, the nebulizer is a tubing with a canister in it. And you put albuterol solution in there generally, or other solution, but albuterol is one of the most commonly used. And attach it to the machine and let them take their treatment. Then after they were finished, sometimes I've seen it listed where the patient thought they were improved or felt better or not. And then listen to their lung fills after the treatment and document it. Occasionally, you might not listen to the breath sounds before if they didn't appear in any distress. But you would almost always listen to them afterwards, after they had taken the treatment, unless it was obvious they weren't having too much trouble before you gave the treatment. And if they said they felt better, you might not listen. But generally, you would do both. And it's obviously on the chart here.

Ranger:          And the O2 stats, what does that require?

Willingham:      O2 saturation requires... It's a sensor that fits on their index
                 finger, and then it gives a reading of the oxygen saturation in
                 their blood. It's used in the operating room and so forth to
                 measure oxygen levels in the blood. And generally, it's above
                 a 95% in a healthy person, 98%, unless they have emphysema
                 or some severe chronic lung disease. Then it may drop down a
                 little bit lower than that.

67.     Ranger Gray asked Doctor Willingham about the medical area in which Savion
would have received his breathing treatments.  He confirmed in substance that areas captured in
relevant video recordings would have been those in which Savion would have received any
breathing treatments in the jail, and that he would not have received them in another off-camera
area.

68.     Doctor Willingham described a breathing treatment in general.  He said that Savion
would sit down in a chair next to clear plastic bags with breathing apparatus.  Each bag would be
labeled with a person's name.  In one video recording, Ranger Gray and Doctor Willingham could
see Savion picking up his bag and then inserting the tube into his mouth.  The tube in his mouth
was the mouthpiece, as Doctor Willingham explained, that would carry the nebulizer solution into
his mouth and ultimately his lungs.  Doctor Willingham said that there was a long tube that runs
to the nebulizer machine, "which nebulizes or turns the liquid into a vapor."

69.     Ranger Gray disclosed to Doctor Willingham that video recordings of what actually
occurred did not match what was written by one or more Individual Defendants on the SVN
Treatment Flowsheet.  Doctor Willingham agreed with Ranger Gray, when reviewing one video
recording, that it did not match the SVN Treatment Flowsheet.  Doctor Willingham confirmed
that, to determine whether there was audible wheezing, a nurse would need to use a stethoscope.
A nurse could not simply listen at a distance, or listen without a stethoscope, and determine

whether there was audible wheezing.  Ranger Gray also disclosed the following, after reviewing

with Doctor Willingham troubling video recordings:

| | |
|---|---|
| Ranger: | I think that's enough videos. I can assure you that after going through all of these dates and times and looking at everything, the only time I see this accurately reflect somewhat on 7/1/2019 when he went to EMS or EMS was called. And the day it most accurately reflects is 7/11/2019 when you saw him. The oxygen levels, I believe, accurately reflect what his actual oxygen level were. And EMS was called, which I believe is going to be the correct action in that case. The purpose of having all of these percentages written down by date, what would be the purpose of having all of those previous percentages coming up to your current date you're testing for? |
| Willingham: | I'm not sure I understand the question. |
| Ranger: | If you were to see a person, and on 6/21, you see 98%, 100%, 98%, 100%, all the way down through 6/25. And then around 7/1, you start seeing 89%, 89%, 87%, 89%, and then you start seeing 88% and you see a trend. |
| Willingham: | It would be a sign that their condition was deteriorating. That they were worsening. |

The following interaction concluded Ranger Gray's interview of Doctor Willingham.

| | |
|---|---|
| Ranger: | In your opinion, do you think this paperwork matches with the video, with your knowledge of medicine? |
| Willingham: | Well... |
| Ranger: | I know you haven't seen all of them. If I were to tell you to go ahead and assume the premise that as a Ranger, I have watched all these videos, and that I can tell you that they follow the same pattern. He walks in, they hand him the little vial of medicine, and then they walk away and he just walks out. Would that be usual or is that not correct? |
| Willingham: | No, sir. The three or four we watched, which they did not listen with a stethoscope, I guess I saw before or after, and so I don't see how they could document that they did. If the patient were stable and doing pretty well, sometimes, as I mentioned before, you might not listen before. You might not listen after |

if the patient said, "I'm fine and I'm good to go," you might not, but it shouldn't be written down.

Ranger:              It would be a blank space, then. Did not listen.

Willingham:          Yeah. Well, I was going to say, have improved. That could be a subjective from the patient.

Ranger:              All right. Well, I'll conclude the interview. The time is 1:50 PM.

E.       Investigations

1.       Medical Records and Death Reports

a.       EMT Records

70.      EMT records, produced by the Midland Fire Department, indicate that EMTs arrived at the Midland County jail on July 11, 2019 to treat Savion.  Savion was given oxygen and Albuterol at 7:42 a.m., and Terbutaline at 7:45 a.m.  Savion's dire condition was unchanged. Savion's lung sounds, for left lower, left upper, right lower, and right upper, were all listed as "wheezing."

71.      The listed chief complaint was "respiratory distress," with respiratory signs and symptoms being acute respiratory distress and asthma.  Savion's vital signs, at 8:00 a.m., from a sitting position, indicated that his blood pressure was only 77/68, with a blood oxygen level of only 77%.  A normal blood pressure is 120/80.  A normal blood oxygen saturation level for a person with healthy lungs, determined through use of a pulse oximeter, is typically between 95% and 100%.  Savion's Glasgow Coma Scale was listed as only 14.  A normal Glasgow Coma Scale is 15. The first and last components of Savion's Glasgow Coma Scale, eye opening response and best motor response, were normal.  However, the middle component, regarding best verbal response, indicated that Savion was confused and not oriented to time, place, and person.  All

Defendants owed constitutional duties to Savion to protect him, and to provide medical care, even if Savion did not know he needed it, could not ask for it, and was not oriented to time, place, and person.  Savion was transported to Midland Memorial Hospital in a vehicle using lights and sirens.

b.     Autopsy

72.     Upon information and belief, there was no autopsy of Savion.  The Lubbock County Medical Examiner indicated that Savion's death was not reportable.  It wrote, "Decedent was not in custody at time of death, sentence commuted on 7/11/19 and arrived to UMC on 7/13/19." Defendants' discharge of Savion from Midland County custody assisted in covering up Defendants' liability, by attempting to assure that there was no autopsy if Savion did not survive. Moreover, Midland County discharged Savion from custody to save money on medical expenses. Regardless, upon information and belief, Midland County's and Soluta's policies, practices, and/or customs, and actions and inactions referenced in this pleading, caused, were proximate causes of, and were moving forces behind Savion's death.

c.     Custodial Death Report (Filed with Attorney General)

73.     Rebecca Graham, with the Midland County Sheriff's Department, filed with the Attorney General of Texas a custodial death report regarding Savion's death.  She wrote that Savion was originally in custody at 10:43 a.m. on June 21, 2019.  A different field in the report indicates that Savion's entry time into the Midland County jail was 11:31 a.m. on June 21, 2019. She also wrote the he died on July 19, 2019.

74.     The Midland County Sheriff's Office wrote that Savion was "released to hospital custody 07/11/2019."  Thus, once Midland County and Soluta realized that Savion would likely not survive, they chose to release him from custody to save expenditure of money for Savion's care.  Midland County admitted in its report that Savion had been receiving medical treatment in

its jail for what Midland County and Soluta knew was a pre-existing medical condition.  The report indicated that the address of the jail was 400 S. Main, Midland, Texas 79702.  The report admitted that Savion's only alleged offense related to alcohol and/or drugs.

### d.  Inmate Death Reporting Report (Filed with Texas Commission on Jail Standards)

75.  Midland County filed with the Texas Commission on Jail Standards an Inmate Death Reporting Form regarding Savion's death.  The report indicated that Savion was booked-in to the jail at 11:31 a.m. on June 21, 2019, and passed away on July 19, 2019 at an unknown time at a Lubbock hospital.  The report also indicated that the last known face-to-face contact with Savion at the jail was at 4:20 p.m. on July 11, 2019, such contact having been made by Lieutenant Adam Hilliard.

### 2.  Midland County Sheriff's Office

76.  The Midland County Sheriff's Office conducted an investigation of Savion's death. Statements were provided by Midland County Officer Daniel T. Stickel, one related to what was referenced as an "Inmate Injury:"

> ON WEDNESDAY, JULY 10, 2019 I, OFFICER STICKEL WAS TAKING ROLLCALL AND ASSUMING THE POSITION OF THE J BLOCK GUARD STATION FOR THE PERIOD OF 07/10/2019 2250 HOURS TO 07/11/2019 0700 HOURS.  I WAS IN FULL UNIFORM WORKING AT THE MIDLAND COUNTY DETENTION CENTER IN MIDLAND, TX.  WITHIN THE DURATION OF MY ROLLCALL, I RECOGNIZED THAT INMATE HALL, SAVION (288075) WAS NOT IN HIS ASSIGNED HOUSING (J-09) AND AFTER INQUIRING TO THE OFFICER WHO I RELIEVED, OFFICER STRICKLAND, I UNDERSTOOD THAT INMATE HALL WAS IN MEDICAL RECIEVING A BREATHING TREATMENT.  I FAILED TO LOG THIS IN MY JAIL SECURITY CHECK (JSC) TAKEN AT THAT TIME.   THIS INFORMATION WAS KNOWN TO MYSELF AS WELL AS THE B SHIFT OFFICER WORKING WITHIN SPECIAL HOUSING, OFFICER JIMENEZ, AS WELL AS THE ON-DUTY NURSES AT THE TIME, INMATE HALL

RETURNED TO THE BLOCK SHORTLY AFTER IRC/JSC AT APPROXIMATELY 2305.

THIS HAS BEEN LOGGED LATE DUE TO A COMMON KNOWLEDGE OF INMATE HALL CONSISTENTLY BEING IN MEDICAL FOR BREATHING TREATMENTS THROUGHOUT THE NIGHT. ALTHOUGH NOT AN EXCUSE, FOR THIS REASON I DID NOT INCLUDE THIS WITHIN MY LOGS.

(Capital letters in original).

Officer Stickel also provided a report with a listed nature of "Medical Referral:"

ON THURSDAY, JULY 11, 2019, I OFFICER STICKEL WAS WORKING AS THE J BLOCK SECURITY OFFICER IN FULL UNIFORM AT THE MIDLAND COUNTY DETENTION CENTER IN MIDLAND, TX. AT APPROXIMATELY 0030 INMATE HALL, SAVION (288075) APPROACHED THE GUARD STATION SHORTLY BEFORE MY SCHEDULED JAIL SECURITY CHECK (JSC) WITHIN THE J BLOCK. INMATE HALL WAS HAVING TROUBLE BREATHING, WHEEZING FOR AIR.  I DID NOT WITNESS AN INHALER IN HIS HAND AT THE TIME OF REQUEST.  HE STATED THAT HE NEED TO GO BACK DOWN TO MEDICAL FOR ANOTHER BREATHING TREATMENT.

DUE TO PRIOR KNOWLEDGE FROM WORKING WITHIN THE SPECIAL HOUSING UNIT I KNEW THAT THE ON-DUTY NURSE WOULD NOT ALLOW FOR INMATE HALL TO RETURN TO MEDICAL WITHIN 4-5 HOURS OF HIS LAST TREATMENT.  BECAUSE I AM NOT MEDICALLY TRAINED, I ONLY KNEW TO GO OFF OF THIS INFORMATION I LEARNED FROM THE ON-DUTY NURSING STAFF.  I INFORMED INMATE HALL OF THIS SITUATION BUT CALLED DOWN TO SPECIAL HOUSING TO VERIFY WITH OFFICER JIMENEZ WHO WAS MANNING THE SPECIAL HOUSING GUARD STATION. OFFICER JIMENEZ OFFERED ME THE SAME INFORMATION BUT CONTACTED THE ON-DUTY NURSE TO VERIFY AS WELL. THE ON-DUTY NURSE, WHOSE IDENTITY IS UNKNOWN TO ME AT THIS TIME, STATED THAT INMATE HALL WOULD NOT BE ABLE TO RETURN FOR A BREATHING TREATMENT UNTIL APPROXIMATELY 4 HOURS AFTER HIS LAST TREATMENT. IF ONE REFERS TO LOG #10331, INMATE HALL WAS IN MEDICAL FOR HIS LAST TREATMENT AT APPROXIMATELY 2250-2300, BY MY KNOWLEDGE.  I ONCE AGAIN INFORMED INMATE HALL OF THIS PROTOCOL, AND HE RETURNED TO HIS ASSIGNED HOUSING(J-09).

IN THE DURATION OF MY JSC, I CHECKED ON INMATE HALL MULTIPLE TIMES AND SAW HE WAS BREATHING, ALTHOUGH WITH

DIFFICULTY.  I APOLOGIZED TO HIM FOR THE SITUATION AT HAND.
HE STATED HE "WAS NOT GONNA MAKE IT' AS IN REFERENCE TO HIM
ABOUT TO PASS OUT.  I TOLD HIM I WOULD KEEP AN EYE ON HIM AND
I WISHED I COULD DO MORE TO HELP.

UPON RECOLLECTION, I COULD HAVE BEEN MORE PERSISTANT TO
THE SPECIAL HOUSING AND MEDICAL STAFF BUT I CHOSE NOT TO
ACT ON PERSISTANCE BUT ON THE INFORMATION AND ADVICE
GIVEN TO ME THROUGH THE ON-DUTY NURSES.

THIS INCIDENT WAS REPORTED LATE.

(Capital letters in original).

Officer Stickel provided a third report, the nature of which was entitled "Medical Referral:"

*LATE ENTRY*

ON THURSDAY, JULY 11, 2019, I, OFFICER STICKEL WAS WORKING IN
FULL UNIFORM AS THE J BLOCK SECUITY OFFICER AT THE MIDLAND
COUNTY DETENTION CENTER IN MIDLAND, TX. AT APPROXIMATELY
0615 INMATE HALL, SAVION (288075) APPROACHED THE GUARD
STATION WHEEZING AND HAVING TROUBLE BREATHING.  HE ONCE
AGAIN STATED HE 'WAS NOT GONNA MAKE IT' AND LEANED ON THE
GUARD STATION IN A MANNER SUGGESTING HE WAS HAVING
TROUBLE MAINTAINING HIS ABILITY TO STAND AND WAS CLOSE TO
PASSING OUT. BECAUSE I AM NOT MEDICALLY TRAINED, I WAS
UNSURE IF THIS WOULD BE CONSIDERED A 'MEDICAL EMERGENCY'
AND DID NOT MAKE THAT CALL VIA RADIO OR PHONE. INMATE HALL
WAS RESPONSIVE AND COULD ANSWER WHEN I WAS SPEAKING TO
HIM.  I INFORMED HIM AGAIN OF THE SITUATION, THAT I COULD NOT
SEND HIM DOWN TO MEDICAL FOR A BREATHING TREATMENT
BECAUSE THE ALOTTED TIME PER THE NURSE ON-DUTY HAD YET TO
PASS.  IN REFERENCE TO LOG #10332, THE ALLOTTED TIME BETWEEN
BREATHING TREATMENTS IS APPROXIMATELY 4 TO 5 HOURS.

I DID ATTEMPT TO CALL DOWN TO THE SPECIAL HOUSING UNIT A
TOTAL OF ONE (l) TIME BUT RECEIVED NO ANSWER. I DID NOT
ATTEMPT AGAIN UNTIL LATER ON WHEN ROLLCALL WAS BEING
CONDUCTED WITH OFFICER CLARK.

IN THE TIME THAT INMATE HALL WAS AT THE GUARD STATION, I
WITNESSED A RED INHALER IN HIS HAND AND I ASKED HIM IF HE WAS
OUT OF THE MEDICATION WITHIN THE INHALER.  HE STATED THAT
HE WAS NOT BUT DID NOT GIVE ANY FURTHER RESPONSE. I
INFORMED INMATE HALL I COULD NOT SEND HIM DOWN TO

MEDICAL AT THIS TIME. BECAUSE I AM NOT MEDICALLY TRAINED, THE SITUATION GAVE ME NERVES, AND I WAS UNSURE OF THE CORRECT PROCEDURE TO CONTINUE WITH AT THE MOMENT. THE ONLY INFORMATION I HAD TO MAKE MY JUDGEMENT WITH WAS THE KNOWLEDGE THAT INMATE HALL COULD NOT RETURN TO MEDICAL FOR ANOTHER BREATHING TREATMENT UNTIL APPROXIMATELY 0830.

UPON RECOLLECTION OF THE SITUATION, AS A SECURITY OFFICER, I SHOULD HAVE GUARANTEED WHAT THE CALL SHOULD HAVE BEEN BY CONTACTING MEDICAL UNTIL THEY ANSWERED. BY GOING OFF OF MY BEST JUDGEMENT WITH THE INFORMATION I HAD BEEN GIVEN I WAS NOT GOING TO CALL A 'MEDICAL EMERGENCY' UNLESS INMATE HALL BECAME UNRESPONSIVE OR LOST CONCIOUSNESS.

WHEN OFFICER CLARK ENTERED J BLOCK AS THE RELIEVING OFFICER, I INFORMED HER OF INMATE HALL'S SITUATION AND HOW MANY TIMES I HAD SENT HIM DOWN TO MEDICAL FOR A BREATHING TREATMENT OVER THE NIGHT. I INCLUDED THE FACT THAT INMATE HALL WAS HAVING TROUBLE BREATHING ON THE 'PASSALONG' SHEET I PRINTED OUT AND WRITTEN ON TO ENSURE THIS AND OTHER INFORMATION FROM MY SHIFT WAS NOT FORGOTTEN. WHILE OFFICER CLARK PERFORMED ROLLCALL SHE TOLD ME TO CALL DOWN TO MEDICAL AND HAVE THEM TAKE INMATE HALL FOR A BREATHING TREATMENT. I OBLIGED AND CONTACTED MEDICAL AT WHICH TIME THEY CONFIRMED I COULD SEND HIM DOWN. AT APPROXIMATELY 0655, INMATE HALL WAS SENT DOWN TO MEDICAL FOR A THIRD BREATHING TREATMENT OF MY KNOWLEDGE. THIS WAS THE LAST INTERACTION THAT I HAD WITH INMATE HALL.

LOGGED LATE

77.     Jailer Stickel admitted, in several ways, not only that he should have done more, but that he could have done more. He admitted that the "situation gave [him] nerves." He evidenced a subjective understanding that Savion was in a serious medical condition. He also stated what was, upon information and belief, Midland County policy, custom, and/or practice of not calling a medical emergency for an inmate in Savion's situation unless the person became unresponsive or lost consciousness. It does not take a medical professional to know that waiting until a person becomes unresponsive or loses consciousness can be too late. The person can suffer

an anoxic brain injury as a result and may not be able to receive treatment from EMS and/or a local emergency room before suffering irreversible brain damage or death.  Mr. Stickel's actions and inactions caused, were proximate causes of, and were producing causes of Savion's conscious pain and suffering and other damages, and potentially death, asserted in this pleading.

### 3.    Texas Rangers

78.    As indicated above, the Texas Rangers were called about Savion's death.  The Texas Rangers do not conduct investigations of custodial deaths to determine whether anyone violated constitutional rights of the decedent, or has civil liability for such death.  Instead, the Texas Rangers investigate such deaths only to determine whether there is potential criminal liability.

79.    Ranger Gray, after taking statements referenced above, and collecting and reviewing evidence, made a number of determinations.  Ranger Gray provided the following in his report.

2.2 The video footage evidence is listed in the file as S1.P1. I compared S1.P1 with the SVN Treatment Flo-Sheet S1.P6 and found discrepancies. Video footage on multiple dates between 06-21-2019 to 7-11-2019 showed conflicting information on the SVN Treatment Flo-Sheet compared with video footage showing the same dates and times.

2.3 The SVN Treatment Flo-Sheet (S1.P6) lists multiple columns, including date, time, O2 stats Pre and post application of medication, Breath Sounds and signature.

2.4 Hall was observed administering his own medication multiple times throughout the video footage on different dates and times. On these same dates and times the SVN Treatment Flo-Sheet shows medical examinations that did not happen to include observations of breathing either visible, audio or with a stethoscope. Oxygen levels were shown to be recorded on the SVT Treatment Flo-Sheet but no evidence of any nurses taking readings were observed on the video footage.

2.5 A check of the video evidence, which was compared to the spreadsheet provided by the Midland County Sheriff's Office, shows approximately sixty (60) total treatments between 06/24/2019 and 07/11/2019, forty three (43) of which were not

logged in the SVT Flo-Chart (S1.P6). Eleven (11) times there was no nurse involvement with regards to treating Hall.

2.6 Out of the sixty (60) treatments logged, Halls O2 levels were checked seven (7) times before treatment, and two (2) times after treatment.

*   *   *

14.5. I collected all the medical records for Hall from the jail. I also collected all the video evidence showing treatments given by jail nurse staff.

14.6. During the investigation it was revealed that a Small Volume Nebulizer (SVN) Sheet, which is used to document the administering of breathing treatments did not match video records.

14.7. Evidence showed that six (6) nurses who have been identified in this file, had fabricated information on a governmental document. Video evidence showed the nurses had fabricated vital signs and medical checks with regards to Halls oxygen levels, and breathing examinations.

14.8. I conducted an interview with Doctor Willingham who had called for Emergency Medical Services (EMS) on the day Hall died.

14.9. During the interview, I showed Doctor Willingham the discrepancies with regards to fabricating Halls Oxygen and breathing signs.

14.10. I asked Doctor Willingham if he believed the nurses in the videos had conducted themselves in the proper manner with regards to documenting Halls condition. Doctor Willingham stated that the nurses did not write down the correct information. Doctor Willingham did not know where the Oxygen levels and breathing sound check would have come from, as they could not be seen in the video footage doing such checks on Hall.

14.11. Taking into account the totality of the facts in this investigation, the following was noted.

14.12. The six (6) nurses identified in this file, fabricated a key medical record with regards to Savion Hall, namely the SVN Flo Sheet. This record is used to document Halls long and short term breathing care. Without this information being correct, Doctor Willingham stated he would not be able to make an accurate diagnosis of medical treatment needed.

Individual Defendants are the six nurses which Ranger Gray references in his report. Thus, there

can be little doubt that they acted in an objectively unreasonable and deliberately indifferent

manner related to Savion and thereby caused all damages, including death, referenced in this pleading.

### 4.    Texas Commission on Jail Standards

80.    The Texas Commission on Jail Standards ("TCJS") conducted an investigation of Savion's death.  The TCJS regularly conducts investigations of custodial deaths in Texas county jails, and it is the State agency charged with enforcing bare minimum jail standards.

81.    Plaintiffs have attempted on several occasions to obtain records regarding Savion's death from the TCJS.  However, due to an ongoing investigation, the TCJS will not release those records.  The court should not entertain any motion to dismiss in this case unless and until Plaintiffs are able to obtain discovery on an expedited basis from the TCJS, the County, and other entities or persons whom Plaintiffs will specify by motion.  Plaintiffs are entitled to plead their best case, and the court should not consider foreclosing any claims, if Defendants attempt to seek such foreclosure, without allowing Plaintiffs basic discovery and the ability to replead thereafter if necessary.

### F.    Defendants' Knowledge and Education

82.    All Individual Defendants knew the seriousness of Savion's condition.  They also knew that pulse oximeter readings were very important in assessing whether Savion could remain in the jail, and receive breathing treatments, or needed to be taken to an emergency department at a local hospital.  Likewise, they knew the importance of using a stethoscope to ascertain Savion's wheezing/bronchial breath sounds.  All Individual Defendants knew that Savion was at severe risk of anoxic brain injury, other injury, and/or death if those Defendants chose not to treat and/or assess Savion or, in the alternative, pretended as though they had treated and/or assessed Savion and wrote, or allowed to be written, false entries into medical records.   Individual Defendants

possessed information in this paragraph due to their education, training, experience, and background.

G.      *Monell* Liability of Midland County and Soluta

    1.      Introduction

83.    Plaintiffs set forth in this section of the pleading additional facts and allegations supporting claims against the County and Soluta pursuant to *Monell v. Department of Soc. Svcs.,* 436 U.S. 658 (1978).  It is Plaintiffs' intent that all facts asserted in this pleading relating to policies, practices, and/or customs of the County and Soluta support such *Monell* claims, and not just facts and allegations set forth in this section.  Such policies, practices, and/or customs alleged in this pleading, individually and/or working together, were moving forces behind and caused the constitutional violations, and damages and death, referenced herein.  These policies, practices, and/or customs are pled individually, alternatively, and collectively.  The County and Soluta knew, when the Decedent was arrested and incarcerated, that their personnel, policies, practices, and/or customs were such that it would not meet its constitutional obligations to provide appropriate care to, and protect, the Decedent.

84.    Moreover, Plaintiffs may set forth in this pleading certain policies which one or more Individual Defendants violated.  Plaintiffs set forth such policies not necessarily to show liability against the County and/or Soluta, but rather to show liability against those Individual Defendants.  If a nurse or officer violates his or her employer's policy, such violation can be some evidence of a constitutional violation.

85.    The County made decisions about policy and practice which it implemented through the County commissioner's court, sheriff, jail administrator, and/or through such widespread practice and/or custom that such practice and/or custom became the policy of the

County as it related to its jail. Further, Soluta's policy, practice, and/or custom is imputed to the County due to non-delegable duties owed by the County to jail inmates. Soluta likewise made decisions about such policy and practice which it implemented through its final policymakers. The Fifth Circuit Court of Appeals has made it clear that Plaintiffs need not allege at the pleading stage the identity of the relevant chief policymaker(s).

86.     There were several policies, practices, and/or customs of the County and Soluta which were moving forces behind, caused, were producing causes of, and/or proximately caused the Decedent's suffering and death, and other damages referenced in this pleading. The County and Soluta made deliberate decisions, acting in a deliberately indifferent and/or objectively unreasonable manner, when implementing and/or allowing such policies, practices, and/or customs to exist. Further, when the County and Soluta implemented and/or consciously allowed such policies, practices, and/or customs to exist, they knew with certainty that the result would be serious injury, suffering, physical illness, and/or death.

### 2.     Soluta's Agreement and Partnership with Midland County to Provide Medical Care Services to Midland County Jail Prisoners

87.     The business of providing, or in some situations unfortunately not providing, healthcare to prisoners in county jails throughout the United States is big business. There are untold millions of dollars made by private companies promising and/or contracting to provide such services. Soluta is no exception to the rule that such companies are in business to make significant profit.

88.     Thus, the provision of medical services to Savion and others in the Midland County jail was clearly a joint effort by and between Midland County and Soluta. In the alternative or in addition, Midland County delegated to Soluta the provision of certain medical care services

to Midland County prisoners.  Regardless, Midland County retained constitutional duties to provide appropriate medical care and mental health care to its prisoners, such that it is liable for any actions and/or inaction of Soluta and/or its employees.  In the alternative, Midland County is liable for damages and death referenced in this pleading resulting from and/or caused by policies, practices, and/or customs of Soluta.

### 3.    Midland County and Soluta Policies, Practices, and Customs

89.    Plaintiffs list beneath this heading the County's and Soluta's policies, practices, and/or customs which Plaintiffs allege, at times upon information and belief, caused, proximately caused, were producing causes of, and/or were moving forces behind all damages referenced in this pleading, including the Decedent's death.  Thus, the County and Soluta are jointly and separately liable for all such damages.

### a.    Policies, Practices, and/or Customs

90.    Midland County and Soluta housed prisoners, such as Savion, and who needed continuous and vitally important medical care too far from the medical station in the Midland County jail.  This resulted in prisoners, such as Savion, with significant respiratory issues, having to travel a lengthy distance from their jail cells to the medical station.  This caused Savion significant suffering, while ambulating to the nurses' station and being concerned about dying along the way due to his inability to breath.

91.    There is little doubt, due to the sheer number of Soluta employees acting at the behest of Soluta and Midland County, who falsified records, failed to provide medical treatment to Savion, and took other actions referenced in this complaint, that what occurred to Savion was no doubt the unwritten policy, and a custom and practice, of Soluta and Midland County with

regard to inmates in the Midland County jail.  It is virtually mathematically impossible that so many persons would be involved in the same conduct, with one inmate, and that such conduct would not be the custom and practice of what was happening in the jail.  Thus, no pattern and practice need be present for Midland County and Soluta to be liable pursuant to single-incident liability.  This case is *Grandstaff* all over again.

92.     It was likewise the policy of Midland County and/or Soluta to understaff medical personnel at the Midland County jail.  Nurse Forbush made it clear that he allegedly believed the amount of work which medical staff at the jail had to do allegedly exceeded their ability to do so in a timely manner.  While Plaintiffs contend that Nurse Forbush significantly exaggerated purported inability to do necessary work, and while Plaintiffs contend that Nurse Forbush was not excused from acting appropriately with regard to Savion as a result of such allegations, Nurse Forbush's allegations are nonetheless some evidence supporting the policy, practice, and/or custom of understaffing the Midland County jail with regard to medical personnel.  Regardless, Defendants could not use as an excuse that they did not have enough time to act appropriately, or did not have sufficient co-workers, and thereby ignore Savion's plight.

93.     Upon information and belief, Midland County had a policy, practice, and/or custom of employing jailers who had not received a normal jailer's license.  Instead, Midland County would employ jailers such as Jailer Stickel, who had only a temporary jailer's license.  Upon information and belief, at the time of Savion's death, Jailer Stickel had only approximately 6 weeks of experience working at a jail.  Upon information and belief, he was originally employed by the Midland County Sheriff's Office on May 9, 2019.  A Texas temporary jailer's license will issue even if the person has not received any jail-related training.  Thus, a temporary license is not evidence of any competency – at all – related to acting as a jailer.  Legislation during the 2019

session attempted to correct this "loophole," so that jails would hopefully have only qualified jailers. Unfortunately, the legislation failed. However, legislative licensure requirements are not the standard in constitutional violation cases. Jailer Stickel's personal status report, with the Texas Commission on Law Enforcement, lists his jail and peace officer-related training. According to that report, as of June 11, 2019, Jailer Stickel had received no training at all. According to that report, he did not even receive CPR training until July 12, 2019, and general first aid training until August 7, 2019. Thus, in addition to the policy, practice, and/or custom of using jailers with only temporary licenses, upon information and belief, Midland County also allowed employees to act as jailers even if they had received no CPR training and/or training in basic first aid techniques. Beyond such medical training, Jailer Stickel did not complete basic county jail training until November 4, 2019.

94. Further, upon information and belief, Midland County had a policy, practice, and/or custom for its jailers not to call a medical emergency, and thus not to obtain EMS or other appropriate medical personnel, unless and until an inmate was unresponsive or unconscious. This was a patently unreasonable policy, practice, and/or custom by any measure. A person who is unresponsive or unconscious could be deceased or, short of that, suffering an event whereby the person's brain is not receiving sufficient oxygen. The person could be having a heart attack. The person could be having a number of serious medical events which, unfortunately, because a jailer had waited until the person was unresponsive or unconscious, would no longer be responsive to any medical treatment.

b.    Other Deaths in Midland County Jail

95. Midland County and Soluta were put on notice – well before Savion's death – of the need to properly observe and deal with inmates in the Midland County jail. There is a history

of other deaths in the jail which indicate that inmates had not been properly observed and/or monitored.

96.      On or about February 4, 2006, Roderick Lydll Hickey died after being in the Midland County jail.  He had been in the jail several hours and began having seizures.  He was removed from the facility and died at a hospital.

97.      On September 27, 2013, Levalgia Gildon, Sr. died after being in the Midland County jail.  On September 26, 2013, a jail officer was conducting roll call.  Mr. Gildon was seen in his cell, sweating profusely.  The jailer had difficulty understanding Mr. Gildon because, upon information and belief, he was seriously ill.  Mr. Gildon was ultimately removed from the facility and admitted to a hospital ICU.  He then passed away.

98.      On December 30, 2013, Dwight Howard Etchison died after being in the Midland County jail.  Mr. Etchison had been arrested for driving while intoxicated.  He was transported to a hospital on December 2, 2013, exhibiting signs of jaundice.  He survived for approximately 4 weeks and then passed away.

99.      On or about March 21, 2014, Norman Lee Mizell passed away after being in the Midland County jail.  He was in a holding cell, where he was found unresponsive.  EMS was notified and he was transported to Midland Memorial Hospital.  He was then pronounced deceased.

100.     On or about June 17, 2018, a Midland Police Department officer transported Stephanie Gonzales to the Midland County jail.  Ms. Gonzales had been walking in a roadway.  The officer determined that Ms. Gonzales' speech was very slurred, and she seemed very lost.  He also learned that she had allegedly taken 10 Xanax pills that day, and had been diagnosed with PTSD and as being bipolar and depressed.  Ms. Gonzales committed suicide in the Midland County jail when she was not watched for well over an hour.  This failure to continuously watch a suicidal

inmate violated all known jail standards.  Moreover, no one at the jail completed the Screening Form for Suicide and Medical/Mental/Developmental Impairments form.  The TCJS requires that such form be completed at intake for every inmate.  The failure to complete this form likewise violated not only all known jail standards, but minimum jail standards promulgated by the TCJS. Midland County was sued as a result of Ms. Gonzales' death and settled the case before trial.

101.    Moreover, it appears that the manner in which Ms. Gonzales was ignored was consistent with policy, practice, and/or custom of Midland County.  This was further evidenced, aside from other allegations in this complaint, by yet another suicide occurring after Stefani committed suicide in the Midland County jail.  A custodial death report filed by Midland County with the Attorney General of Texas, on June 4, 2019, reported the death of Christopher Beau Duboise.  The report indicates that Mr. Duboise appeared intoxicated by alcohol and/or drugs.  The summary portion of the report reads that, on May 23, 2019, at approximately 9:00 p.m., Mr. Duboise was brought into custody by the Midland County Sheriff's Office.  He was arrested, as was Ms. Gonzales, on a public intoxication charge.

102.    Mr. Duboise was placed on a stool in booking awaiting to be received.  He then attacked another inmate who was being received.  He further refused to answer suicide screening questions.  He was thus placed on a "mental health check."  Presumably, the check was for 15-minute observations.  As pointed out elsewhere in this pleading, even 15-minute observations are insufficient to stop suicide.  Suicidal persons must be placed on constant observation.

103.    Ultimately, a jailer was able to have Mr. Duboise answer the suicide screening questions.  It appears that based simply on those answers, Mr. Duboise was moved to another cell and allowed to have clothing with which he could hang himself.  The summary indicates that, at approximately 9:55 p.m., a jailer had a face-to-face check on Mr. Duboise.  The jailer did not

conduct her next check for 17 minutes.  It was then that she noticed that Mr. Duboise was in the

back of the cell with a shirt tied around his neck on one end, and tied to a handicap bar on the other

end.  Mr. Duboise was eventually transported by EMS to Midland Memorial Hospital.  He later

died.

104.     David Criner, as of approximately March 2020, became Midland County's first

newly-elected Sheriff in over thirty years.  Newly-elected Sheriff Criner indicated that the first

action he would take as Sheriff was to resolve ongoing Texas Rangers investigations into the

Midland County Sheriff's Office.  He said that he wanted the Office to start "with a new sheet of

paper and go forward from there."  Sheriff Criner said, "It's important for Midland County itself,

the citizens of Midland County, and also the employees of the Midland County Sheriff's Office,

because right now, there's a dark cloud over the sheriff's office."  Newly-elected Sheriff Criner

also admitted that the jail's mental health unit had only been operating eight hours per day – on

weekdays.  Moreover, upon information and belief, before Sheriff Criner's election, the Midland

County Sheriff's Office was being investigated for alleged unlawful interception of oral or

electronic communications, abuse of official capacity, and/or tampering with a governmental

record and theft.   Thus, tampering with governmental records, as occurred with regard to Savion,

was apparently the practice and/or custom at the Midland County jail.

III.     Causes of Action

    A.     14th Amendment Due Process Claims Under 42 U.S.C. § 1983: Objective
        Reasonableness Pursuant to *Kingsley v. Hendrickson*

105.     In *Kingsley v. Hendrickson,* 135 S. Ct. 2466 (2015), a pretrial detainee sued several

jail officers alleging that they violated the 14th Amendment's Due Process Clause by using

excessive force against him.  *Id*. at 2470.  The Court determined the following issue: "whether, to

prove an excessive force claim, a pretrial detainee must show that the officers were *subjectively* aware that their use of force was unreasonable, or only that the officer's use of that force was *objectively* unreasonable." *Id.* (emphasis in original). The Court concluded that the objectively unreasonable standard was that to be used in excessive force cases, and that an officer's subjective awareness was irrelevant. *Id.* The Court did so, acknowledging and resolving disagreement among the Circuits. *Id.* at 2471-72.

106.    The Court flatly wrote "the defendant's state of mind is not a matter that a plaintiff is required to prove." *Id.* at 2472. Instead, "courts must use an objective standard." *Id* at 2472-73. "[A] pretrial detainee must show only that the force purposefully or knowingly used against him was objectively unreasonable." *Id.* at 2473. Thus, the Court required no *mens rea*, no conscious constitutional violation, and no subjective belief or understanding of offending police officers, or jailers, for an episodic claim but instead instructed all federal courts to analyze officers', or jailers', conduct on an objective reasonability standard. Since pretrial detainees' rights to receive reasonable medical and mental health care, to be protected from harm, and not to be punished at all, also arise under the 14th Amendment's Due Process Clause, there is no reason to apply a different standard when analyzing those rights.

107.    It appears that this objective reasonableness standard is now the law of the land. In *Alderson v. Concordia Parish Corr. Facility*, 848 F.3d 415 (5th Cir. 2017), the Fifth Circuit Court of Appeals considered appeal of a pretrial detainee case in which the pretrial detainee alleged failure-to-protect and failure to provide reasonable medical care claims pursuant to 42 U.S.C. § 1983. *Id.* at 418. The court wrote, "Pretrial detainees are protected by the Due Process Clause of the Fourteenth Amendment." *Id.* at 419 (citation omitted). The Fifth Circuit determined, even though *Kingsley* had been decided by the United States Supreme Court, that a plaintiff in such a

case still must show subjective deliberate indifference by a defendant in an episodic act or omission case. *Id.* at 419-20. A plaintiff must still show that actions of such an individual person acting under color of state law were "reckless." *Id.* at 420 (citation omitted). However, concurring Circuit Judge Graves dissented to a footnote in which the majority refused to reconsider the deliberate indifference, subjective standard, in the Fifth Circuit. *Id.* at 420 and 424-25.[1]

---

[1] Circuit Judge Graves wrote: "I write separately because the Supreme Court's decision in *Kingsley v. Hendrickson*, —— U.S. ——, 135 S.Ct. 2466, 192 L.Ed.2d 416 (2015), appears to call into question this court's holding in *Hare v. City of Corinth*, 74 F.3d 633 (5th Cir. 1996). In *Kingsley*, which was an excessive force case, the Supreme Court indeed said: "Whether that standard might suffice for liability in the case of an alleged mistreatment of a pretrial detainee need not be decided here; for the officers do not dispute that they acted purposefully or knowingly with respect to the force they used against Kingsley." *Kingsley*, 135 S.Ct. at 2472. However, that appears to be an acknowledgment that, even in such a case, there is no established subjective standard as the majority determined in *Hare*. Also, the analysis in *Kingsley* appears to support the conclusion that an objective standard would apply in a failure-to-protect case. *See id.* at 2472–2476.

Additionally, the Supreme Court said:

> We acknowledge that our view that an objective standard is appropriate in the context of excessive force claims brought by pretrial detainees pursuant to the Fourteenth Amendment may raise questions about the use of a subjective standard in the context of excessive force claims brought by convicted prisoners. We are not confronted with such a claim, however, so we need not address that issue today.

*Id.* at 2476. This indicates that there are still different standards for pretrial detainees and DOC inmates, contrary to at least some of the language in *Hare*, 74 F.3d at 650, and that, if the standards were to be commingled, it would be toward an objective standard as to both on at least some claims.

Further, the Ninth Circuit granted en banc rehearing in *Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016), after a partially dissenting panel judge wrote separately to point out that *Kingsley* "calls into question our precedent on the appropriate state-of-mind inquiry in failure-to-protect claims brought by pretrial detainees." *Castro v. County of Los Angeles*, 797 F.3d 654, 677 (9th Cir. 2015). The *en banc* court concluded that *Kingsley* applies to failure-to-protect claims and that an objective standard is appropriate. *Castro*, 833 F.3d at 1068–1073.

In *Estate of Henson v. Wichita County*, 795 F.3d 456 (5th Cir. 2014), decided just one month after *Kingsley*, this court did not address any application of *Kingsley*. Likewise, the two subsequent cases also cited by the majority did not address or distinguish *Kingsley*. *Hyatt v. Thomas*, 843 F.3d 172 (5th Cir. 2016), and *Zimmerman v. Cutler*, 657 Fed.Appx. 340 (5th Cir. 2016). Because I read

108.    The majority opinion gave only three reasons for the court's determination that the law should not change in light of *Kingsley*.  First, the panel was bound by the Fifth Circuit's "rule of orderliness."  *Id.* at 420 n.4.  Second, the Ninth Circuit was at that time the only circuit to have extended *Kingsley's* objective standard to failure-to-protect claims.  *Id.*  Third, the Fifth Circuit refused to reconsider the law of the Circuit in light of United State Supreme Court precedent, because it would not have changed the results in *Alderson*.  *Id.*  Even so, the Fifth Circuit noted, years ago, that the analysis in pretrial detainee provision of medical care cases is the same as that for pretrial detainee failure-to-protect cases.  *Hare v. City of Corinth*, 74 F.3d 633, 643 (5th Cir. 1996).

109.    Thus, the trail leads to only one place – an objective unreasonableness standard, with no regard for officers', jailers', or nurses' subjective belief or understanding, should apply in this case and all pretrial detainee cases arising under the Due Process Clause of the 14th Amendment.  The Fifth Circuit, and the district court in this case, should reassess Fifth Circuit law in light of *Kingsley* and apply an objective unreasonableness standard to constitutional claims in this case.  The court should not apply a subjective state of mind and/or deliberate indifference standard.  The Supreme Court discarded the idea that a pretrial detainee should have such a burden.

B.    Remedies for Violation of Constitutional Rights

110.    The United States Court of Appeals for the Fifth Circuit has held that using a state's wrongful death and survival statutes creates an effective remedy for constitutional rights claims pursuant to 42 U.S.C. § 1983.  Therefore, Ms. Robinson individually, Ms. Busby on behalf of minors L.H. and T.H., and Ms. Ambler on behalf of Ms. Robinson and Claimant Heirs, seeks for

---

*Kingsley* as the Ninth Circuit did and would revisit the deliberate indifference standard, I write separately."

causes of action asserted in this complaint all remedies and damages available pursuant to Texas and federal law, including but not necessarily limited to the Texas wrongful death statute (Tex. Civ. Prac. & Rem. Code § 71.002 *et seq.*), the Texas survival statute (Tex. Civ. Prac. & Rem. Code § 71.021), the Texas Constitution, common law, and all related and/or supporting case law.  If the Decedent had lived, the Decedent would have been entitled to bring a 42 U.S.C. § 1983 action for violation of the United States Constitution and obtain remedies and damages provided by Texas and federal law.  Plaintiffs incorporate this remedies section into all sections in this complaint asserting cause(s) of action.

<u>C.     Cause of Action Against Individual Defendants and Mr. Stickel Under 42 U.S.C. § 1983 for Violation of Constitutional Rights</u>

111.     In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, Individual Defendants and Mr. Stickel are liable to Plaintiffs and Claimant Heirs, pursuant to 42 U.S.C. § 1983, for violating the Decedent's rights to reasonable medical/mental health care, to be protected, and/or not to be punished.  These rights are guaranteed by at least the 8th and/or 14th Amendments to the United States Constitution.  Pre-trial detainees are entitled to protection and not to be punished at all since they have not been convicted of any alleged crime resulting in their incarceration.

112.     Individual Defendants and Mr. Stickel acted and failed to act under color of state law at all times referenced in this pleading.  They wholly or substantially ignored the Decedent's obvious serious medical needs, and they were deliberately indifferent to and acted in an objectively unreasonable manner regarding those needs.  They failed to protect the Decedent, and their actions and/or inaction referenced in this pleading resulted in unconstitutional punishment of the

Decedent.   Individual Defendants and Mr. Stickel were aware of the excessive risk to the Decedent's health and safety and were aware of facts from which an inference could be drawn of serious harm, suffering, and death.   Moreover, they in fact drew that inference.   Individual Defendants and Mr. Stickel violated clearly–established constitutional rights, and their conduct was objectively unreasonable in light of clearly–established law at the time of the relevant incidents.

113.    All Individual Defendants and Mr. Stickel are also liable pursuant to the theory of bystander liability.   Bystander liability applies when the bystander officer/nurse (1) knows that a fellow officer/nurse is violating a person's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act.   As demonstrated through facts asserted in this pleading, all Individual Defendants' and Mr. Stickel's actions and inaction meet all three elements. They are therefore also liable to Plaintiffs and Claimant Heirs pursuant to this theory.

114.    In the alternative, Individual Defendants' and Mr. Stickel's deliberate indifference, conscious disregard, state of mind, subjective belief, subjective awareness, and/or mental culpability are irrelevant to determination of constitutional violations set forth in this section of this pleading.   The United States Supreme Court, in *Kingsley v. Hendrickson,* 135 S. Ct. 2466 (2015), determined the state of mind necessary, if any, for officers/jailers sued in a case alleging excessive force against a pretrial detainee in violation of the 14th Amendment's Due Process Clause.   *Id* at 2470-71.   Some constitutional rights set forth in this section of the pleading, and constitutional rights affording pretrial detainees protection against excessive force, flow from the 14th Amendment's Due Process Clause.   *Id.*   Since such constitutional protections flow from the same clause, analysis of what is necessary to prove such constitutional violations is identical.

115.    Individual Defendants and Mr. Stickel are not entitled to qualified immunity.[2] Regarding any Individual Defendants' possible assertion of qualified immunity, upon information and belief:

- Soluta was systematically organized to perform the major administrative task of providing medical care in Texas jails.

---

[2]   The defense of qualified immunity is, and should be held to be, a legally impermissible defense. In the alternative, it should be held to be a legally impermissible defense except as applied to state actors protected by immunity in 1871 when 42 U.S.C. § 1983 was enacted.  Congress makes laws. Courts do not.  However, the qualified immunity defense was invented by judges.  When judges make law, they violate the separation of powers doctrine, and the Privileges and Immunities Clause of the United States Constitution.  Plaintiffs respectfully make a good faith argument for the modification of existing law, such that the court–created doctrine of qualified immunity be abrogated or limited.

Individual Defendants and Mr. Stickel cannot show that they are entitled to qualified immunity. This should be Individual Defendants' and Mr. Stickel's burden, if they choose to assert the alleged defense.  Qualified immunity, as applied to persons not immunized under common or statutory law in 1871, is untethered to any cognizable legal mandate and is flatly in derogation of the plain meaning and language of Section 1983.  *See Ziglar v. Abassi*, 137 S. Ct. 1843, 1870-72 (2017) (Thomas, J., concurring).  Qualified immunity should have never been instituted as a defense, without any statutory, constitutional, or long-held common law foundation, and it is unworkable, unreasonable, and places too high a burden on plaintiffs who suffer violation of their constitutional rights.  Joanna C. Schwartz, *The Case Against Qualified Immunity,* 93 Notre Dame L. Rev. 1797 (2018) (observing that qualified immunity has no basis in the common law, does not achieve intended policy goals, can render the Constitution "hollow," and cannot be justified as protection for governmental budgets); and William Baude, *Is Qualified Immunity Unlawful?*, 106 Calif. L. Rev. 45, 82 (2018) (noting that, as of the time of the article, the United States Supreme Court decided 30 qualified immunity cases since 1982 and found that defendants violated clearly established law in only 2 such cases).  Justices including Justice Thomas, Justice Breyer, Justice Kennedy, and Justice Sotomayor have criticized qualified immunity.  *Schwartz, supra* at 1798–99. *See also Cole v. Carson*, _ F.3d _, 2019 WL 3928715, at * 19-21, & nn. 1, 10 (5th Cir. Aug. 21, 2019) (en banc) (Willett, J., Dissenting). Additionally, qualified immunity violates the separation of powers doctrine of the Constitution. *See generally* Katherine Mims Crocker, *Qualified Immunity and Constitutional Structure*, 117 Mich. L. Rev. 1405 (2019) (available at https://repository.law.umich.edu/mlr/vol117/iss7/3).  Plaintiffs include allegations in this footnote to assure that, if legally necessary, the qualified immunity abrogation or limitation issue has been preserved.

- Soluta was at the time of incidents relevant to this case in the business of administering correctional healthcare services.

- Soluta has made millions of dollars each year from its contracts with Texas jails, including at least $768,000 from Midland County in the first year of their contractual relationship (beginning in year 2013).  As of an Addendum to the contract between Midland County and Soluta, effective October 1, 2018, yearly compensation to be paid by Midland County to Soluta for medical services rendered for the jail had increased to $1,308,000.  Based on one estimate, Soluta employed approximately 65 people and had annual revenue of approximately $25,000,000.  Its headquarters are in Austin, Texas.

- Individual Defendants were employees of Soluta at all relevant times, Soluta at the time being a systematically–organized entity to assume a major lengthy administrative task with limited direct supervision by Midland County, undertaking that task for profit and while in competition with other for-profit firms providing similar services.

- Market forces existed at all relevant times that were likely to provide Soluta with strong incentives to avoid overly timid, insufficiently vigorous, unduly fearful, or non-arduous employee job performance.

- Ordinary marketplace pressures were present at all relevant times regarding Soluta's provision of services to Midland County.

- Soluta had a multi-year contract with Midland County with renewal periods, such that its performance was disciplined by pressure from potentially competing firms who could try to take its place in providing services to Midland County.

- Soluta was required to purchase insurance to compensate victims of civil rights torts, such insurance coverage being substantial.  Soluta provided medical malpractice and professional liability coverage in an amount of not less than $500,000 per occurrence and $1,500,000 in the aggregate, and comprehensive general liability coverage in the amount of $1,000,000 per occurrence and $3,000,000 in the aggregate.

- Soluta, upon information and belief, maintained a risk management and legal defense team ready to aggressively address each claim or lawsuit against it.

- Soluta was operated with relatively little ungoing Midland County supervision.

- Soluta employed medical professionals who faced potential liability both for choosing a course of treatment that is too aggressive and for choosing a course not aggressive enough, rather than jailers, who rarely face liability for not using enough force.

- Soluta's primary function at the jail was providing healthcare services.

- Individual Defendants were overseen and employed by Soluta.

- Soluta, as opposed to Midland County, took the lead in developing relevant policy regarding healthcare provision in the Midland County jail.

- Soluta developed and maintained the Midland County jail's healthcare policies and procedures manual.

- Midland County could not fire or discipline Soluta's employees.

- Individual Defendants had discretion to take certain actions which Midland County employees lacked the authority to do.

- Individual Defendants did not have a broad range of duties other than providing health care.

- Individual Defendants' job titles implied that they were evaluated based on the business of their performance in providing health care, and their primary job purposes were providing health care to Midland County detainees.

- Soluta had substantial latitude to ensure that Individual Defendants were adequately motivated (such as through employer indemnification, increased benefits, and higher pay, each being used as a tool).

- Individual Defendants were "at will" employees and could be discharged at any time without cause.

- Soluta determined Individual Defendants' wages, conditions of employment, and availability of benefits.

- Soluta marketed its ability to attract qualified people to public service as an aspect of its sales pitch to Midland County and other governmental clients.

- Soluta, and likely Individual Defendants, knew that they could be subject to liability without the benefit of qualified immunity; even so Soluta was able to attract qualified employees.

- Soluta's contract with Midland County provided for Soluta to provide people on a man-hour basis, as opposed to an individual employee basis,

which allowed Soluta to replace employees who might be distracted by litigation with comparable professionals.

- Soluta contracted to indemnity Midland County for liability caused by Soluta or its agents, employees, or contractors.

These factors, pursuant to controlling authority, indicate that Individual Defendants employed by Soluta are not entitled to qualified immunity.

116.    Individual Defendants' and Mr. Stickel's denial of reasonable medical care, and other actions and/or inaction set forth in this pleading, caused, proximately caused, and/or were producing causes of the Decedent's suffering and death and other damages mentioned and/or referenced in this pleading, including but not limited to those suffered by Plaintiffs and Claimant Heirs.

117.    Therefore, the Decedent's estate and/or his heirs at law (Claimant Heirs) suffered the following damages, for which they seek recovery from Individual Defendants and Mr. Stickel:

- the Decedent's conscious physical pain, suffering, and mental anguish;

- the Decedent's medical expenses;

- the Decedent's funeral expenses; and

- exemplary/punitive damages.

118.    Plaintiffs also seek and are entitled to all remedies and damages available to Ms. Robinson, minor L.H., and minor T.H., individually, for 42 U.S.C. § 1983 claims for constitutional violations.  Ms. Robinson seeks such damages for the wrongful death of her son, and minors L.H. and T.H. are entitled to such damages for the wrongful death of their father.  Those damages were caused and/or proximately caused by Individual Defendants and Mr. Stickel.  Their actions caused, were proximate causes of, and/or were producing causes of the following damages suffered by Ms. Robinson and/or Claimant Heirs, for which they are entitled to compensation for:

- loss of services that Ms. Robinson would have received from the Decedent;

- expenses for the Decedent's funeral;

- past mental anguish and emotional distress suffered by Ms. Robinson, minor L.H., and minor T.H. resulting from and caused by the Decedent's death;

- future mental anguish and emotional distress suffered by Ms. Robinson, minor L.H., and minor T.H. resulting from and caused by the Decedent's death;

- loss of companionship and/or society that Ms. Robinson, minor L.H., and minor T.H. would have received from the Decedent; and

- exemplary/punitive damages.

Exemplary/punitive damages are appropriate in this case to deter and punish clear and unabashed violation of the Decedent's constitutional rights. Individual Defendants' and Mr. Stickel's actions and inaction showed a reckless or callous disregard of, or indifference to, the Decedent's rights and safety. Moreover, Ms. Robinson individually, Ms. Busby on behalf of minors L.H. and T.H., and Ms. Ambler on behalf of Ms. Robinson and minors L.H. and T.H., seek reasonable and necessary attorneys' fees available pursuant to 42 U.S.C. §§ 1983 and 1988.

D.     Cause of Action Against Midland County and Soluta Under 42 U.S.C. § 1983 for Violation of Constitutional Rights

119.     In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, Defendants Midland County and Soluta are liable to Plaintiffs and Claimant Heirs, pursuant to 42 U.S.C. § 1983, for violating the Decedent's rights to reasonable medical care, to be protected, and/or not to be punished. These rights are guaranteed by at least the 8th and/or 14th Amendments to the United States Constitution.

Pretrial detainees are entitled to be protected and not to be punished at all, since they have not been convicted of any alleged crime resulting in their incarceration.

120.    The County and Soluta acted or failed to act, through natural persons including Individual Defendants, under color of state law at all relevant times.  The County's and Soluta's policies, practices, and/or customs were moving forces behind and caused, were producing causes of, and/or were proximate causes of the Decedent's suffering, damages, and death, and all damages suffered by Ms. Robinson and Claimant Heirs.

121.    The Fifth Circuit Court of Appeals has made it clear that Plaintiffs need not allege the appropriate chief policymaker at the pleading stage.  Nevertheless, out of an abundance of caution, the sheriff of the County was the County's relevant chief policymaker over matters at issue in this case.  Moreover, in addition, and in the alternative, the County's jail administrator was the relevant chief policymaker over matters at issue in this case.  Finally, in addition, and in the alternative, the County's commissioners' court was the relevant chief policymaker.  Plaintiffs leave it to the court to determine the relevant chief policymaker for Soluta, and/or how that relevant chief policymaker must interact, if at all, with the relevant chief policymaker of Midland County in order to establish liability.  Midland County had non-delegable duties to provide care, protect, and not punish its inmates.  Midland County could not insulate itself from liability by contracting with Soluta and allowing Soluta to do what Midland County was constitutionally-obligated to do.

122.    The County and Soluta were deliberately indifferent regarding policies, practices, and/or customs developed and/or used with regard to issues addressed by allegations set forth above.  They also acted in an objectively unreasonable manner.  Policies, practices, and/or customs referenced above were moving forces behind and caused violation of the Decedent's rights and showed deliberate indifference to the known or obvious consequences that constitutional violations

would occur.  The County's and Soluta's relevant policies, practices, and/or customs, whether written or not, were also objectively unreasonable as applied to the Decedent.  Therefore, the Decedent's estate and/or his heirs at law (Claimant Heirs) suffered the following damages, for which they seek recovery, through the estate administrator, from the County and Soluta, jointly and separately:

- The Decedent's conscious physical pain, suffering, and mental anguish;

- The Decedent's medical expenses; and

- The Decedent's funeral expenses.

123.    Plaintiffs also seek and/or are entitled to all remedies and damages available to Ms. Robinson, minor L.H., and minor T.H., individually, for 42 U.S.C. § 1983 claims for constitutional violations.  The County's and Soluta's policies, practices, and/or customs caused, were proximate and/or producing causes of, and/or were moving forces behind and caused the following damages suffered by Ms. Robinson and Claimant Heirs:

- loss of services that Ms. Robinson would have received from the Decedent;

- expenses for the Decedent's funeral;

- past mental anguish and emotional distress suffered by Ms. Robinson, minor L.H., and minor T.H. resulting from and caused by the Decedent's death;

- future mental anguish and emotional distress suffered by Ms. Robinson, minor L.H., and minor T.H. resulting from and caused by the Decedent's death; and

- loss of companionship and/or society that Ms. Robinson, minor L.H., and minor T.H. would have received from the Decedent.

Moreover, Plaintiffs and Claimant Heirs seek reasonable and necessary attorneys' fees available pursuant to 42 U.S.C. §§ 1983 and 1988.

IV.     Concluding Allegations and Prayer

A.      Conditions Precedent

124.    All conditions precedent to assertion of all claims herein have occurred.

B.      Use of Documents at Trial or Pretrial Proceedings

125.    Plaintiffs and Claimant Heirs intend to use at one or more pretrial proceedings and/or at trial all documents produced by Defendants in this case in response to written discovery requests, with initial disclosures (and any supplements or amendments to same), and in response to Public Information Act request(s).

C.      Jury Demand

126.    Plaintiffs and Claimant Heirs demand a jury trial on all issues which may be tried to a jury.

D.      Prayer

127.    For these reasons, Plaintiffs ask that Defendants be cited to appear and answer, and that Plaintiffs and Claimant Heirs have judgment for damages within the jurisdictional limits of the court and against all Defendants, jointly and severally, as legally available and applicable, for all damages referenced above and below in this pleading:

a)      actual damages of and for Ms. Robinson, individually; Ms. Busby, for and on behalf of minors L.H. and T.H.; and Ms. Ambler, for Mr. Robinson, minors L.H. and T.H., and Estate of Savion Vashon Hall and Savion Vashon Hall's heirs-at-law:

- Savion's conscious physical pain, suffering, and mental anguish;

- Savion's medical expenses;

- loss of services that Ms. Robinson would have received from Savion;

- expenses for Savion's funeral;

- past mental anguish and emotional distress suffered by Ms. Robinson, and minors L.H. and T.H., resulting from and caused by Savion's death;

- future mental anguish and emotional distress suffered by Ms. Robinson, and minors L.H. and T.H., resulting from and caused by Savion's death; and

- loss of companionship and/or society that Ms. Robinson, and minors L.H. and T.H., would have received from Savion;

b)      exemplary/punitive damages for Plaintiffs and Claimant Heirs from Individual Defendants and Mr. Stickel;

c)      reasonable and necessary attorneys' fees for Plaintiffs and Claimant Heirs, through trial and any appeals and other appellate proceedings, pursuant to 42 U.S.C. §§ 1983 and 1988;

d)      court costs and all other recoverable costs;

e)      prejudgment and postjudgment interest at the highest allowable rates; and

f)      all other relief, legal and equitable, general and special, to which Plaintiffs and Claimant Heirs are entitled.

Respectfully submitted:


Law Offices of Dean Malone, P.C.


    /s/ T. Dean Malone
    T. Dean Malone

T. Dean Malone
Texas State Bar No. 24003265
dean@deanmalone.com
Michael T. O'Connor
Texas State Bar No. 24032922
michael.oconnor@deanmalone.com
Kristen Leigh Homyk
Texas State Bar No. 24032433
kristen.homyk@deanmalone.com
Law Offices of Dean Malone, P.C.
900 Jackson Street, Suite 730
Dallas, Texas 75202
Telephone:    (214) 670-9989
Telefax:      (214) 670-9904

Attorneys for Plaintiff Angela Robinson and
Independent Administrator Rachel Ambler


    /s/ George Tex Quesada
George Tex Quesada
Texas State Bar No. 16427750
quesada@textrial.com
Sommerman, McCaffity, Quesada & Geisler, L.L.P.
3811 Turtle Creek Blvd., Suite 1400
Dallas, Texas 75219
Telephone:    (214) 720-0720
Telefax:      (214) 720-0184

and

_____/s/ Richard Hardy_____

Richard Hardy
Texas State Bar No. 24012785
rhardy@fchclaw.com
Faddoul, Cluff, Hardy & Conaway
1931 E. 37th Street, Suite 2
Odessa, Texas 79762
Telephone:      (432) 335-0399
Telefax:         (432) 335-0398

Attorneys for Plaintiff Clara Busby and Independent
Administrator Rachel Ambler