UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
MIDLAND-ODESSA DIVISION

| | | |
|---|---|---|
| ANGELA ROBINSON, individually; | § | |
| CLARA BUSBY, as next friend, guardian, | § | |
| and parent of and for minors L.H. and T.H.; | § | |
| and RACHEL AMBLER, as independent | § | |
| administrator of, and on behalf of, ANGELA | § | |
| ROBINSON, minors L.H. and T.H., the | § | |
| ESTATE OF SAVION VASHON HALL, and | § | |
| SAVION VASHON HALL'S heirs-at-law, | § | CIV. ACT. NO. 7:21-CV-00111-DC |
| | § | |
| Plaintiffs, | § | JURY DEMANDED |
| | § | |
| v. | § | |
| | § | |
| MIDLAND COUNTY, TEXAS; SOLUTA, | § | |
| INC.; ADEOLA C. ADESOMI; FLOR | § | |
| ESTRADA; TIMOTHY GENE FORBUSH, | § | |
| JR.; ESTHER EBELE IHEDIWA; LILIAN | § | |
| KERUBO OKERI; KELLY V. ROBINS; and | § | |
| DANIEL T. STICKEL | § | |
| | | |
| Defendants. | | |

## Plaintiffs' Response to Midland County Defendants' Rule 12(c) Motion to Dismiss (Doc. 31)

TO THE UNITED STATES DISTRICT COURT:

**I.      Summary.**

Midland County has a nondelegable constitutional duty to provide medical care to its

detainees. It cannot avoid its constitutional duties by contracting with a private entity and

delegating its policymaking authority to it. Midland County remains liable for the unconstitutional

policies and customs adopted by its delegee, Soluta. There is no issue of respondeat superior vis-

à-vis Midland County and Soluta. Both Soluta and Midland County equally bear *Monell* liability

as co-policymakers. That Soluta's nurses acted as a matter of policy is evident from the fact that

each of a half dozen nurses all acted similarly over the course of several days. On more than 50

occasions they failed to use a pulse oximeter to obtain Savion Hall's actual oxygen saturation

levels, and also failed to use stethoscopes to determine Hall's breathing impairment and lung function. Instead, they simply made-up misleading oxygen readings and observations, day after day, purporting to show that Hall was responding positively to treatment when he was instead becoming increasingly ill, and died. Not one employee objected, questioned, or refused to participate in this practice. When so many employees engage in the same unlawful conduct at the same time, a factfinder can and should conclude that they acted pursuant to governmental policy.

In a final desperate act to avoid its responsibility for yet another jail death, Midland County discharged Hall from custody as Hall was dying in the hospital. This is anything but exculpating. Midland County's conduct could not speak louder of its complicity in Soluta's custom and policy of denying detainees critically needed medical care.

Similarly, Midland County's jailer, Defendant Daniel Stickel, was deliberately indifferent to Hall's critical, deteriorating condition. Twice Stickel ignored Hall's pleas that he was "not gonna to make it" without further medical treatment. Although Hall's critical condition was obvious, Hall could not have been plainer in telling Stickel that Hall believed he was going to die if he did not receive medical help. Even in Stickel's self-serving statements made after the fact, in which he attempts to rationalize his misconduct, Stickel acknowledges that he knew Hall was suffering and that his condition constituted a potential emergency. Stickel, however, made the conscious decision not to declare an emergency unless and until Hall reached the critical point of losing consciousness. Thus, Stickel admitted that he delayed emergency medical treatment for an obviously suffering and ill detainee until the detainee's condition became immediately life-threatening and potentially unrecoverable. Stickel's admission concedes deliberate indifference and defeats qualified immunity. Defendants' attempt to ascribe Stickel's decisions to alleged reliance upon medical advice from Soluta nurses is a red herring. This is an unsupported

embellishment of the record which collapses and misstates events, indulges inferences in favor of Defendants, and violates the standard of review. Even if the argument had factual support, Defendants' theory would at most raise a fact issue as to Stickel's credibility. In fact, Stickel did not even claim to have inquired about or obtained any advice from *any* medical professional regarding Hall's deteriorating condition. Instead, he ignored Hall's pleas that he was "not gonna make it," and defined a medical emergency in the most absurd terms: losing consciousness. Such meager attempts to provide assistance as Stickel may have made, i.e., checking if Hall was breathing and asking if his inhaler was empty, fall far short of Stickel's constitutional obligations.

## II.    Pleaded Facts.

Savion Hall was arrested and taken to the Midland County jail on June 21, 2019. (¶ 18)[1] Intake forms stated that Hall had been hospitalized recently and contained the handwritten notation: "06/20/19 due to breathing problem." (¶ 18) The intake records also showed that Hall was prescribed Prednisone, had a chronic illness, and suffered from asthma and shortness of breath. (¶ 18) A progress note at intake stated that Hall's vital signs were within normal limits. (¶ 18) Although it is unknown to Plaintiff whether the information is accurate, Hall's oxygen saturation level was listed at 99% at intake, and his blood pressure at 127/74 at intake. (¶ 18)

Ten days later, on July 1, 2019, Hall was transported to a hospital emergency room for issues related to his asthma. (¶ 19) Discharge instructions included the instruction that Hall return to the emergency department for further evaluation if his symptoms worsened. (¶ 19) Jail personnel recognized that Hall's condition was serious, and on July 9 Hall was assigned a lower bunk due to his medical diagnosis for asthma. (¶ 19)

---

[1] Paragraph references are to Plaintiffs' Original Complaint.

During Hall's incarceration at the Midland County Jail, Midland County contracted with a private entity, Soluta, to provide medical care at the jail. (¶¶ 18, 23, 65, 87, 88) Hall purportedly received a number of SVN (small volume nebulizer[2]) breathing treatments from several Soluta nurses. (¶ 23) Soluta kept an SVN Treatment Flo-Sheet purporting to record oxygen levels and breathing observations allegedly obtained at the time of treatment. (¶ 23) Columns are provided to record oxygen saturation levels both before and after treatment. (¶ 23) Additional columns are provided to record bronchial breath sounds before and after treatment. (¶ 23) To obtain these readings, nurses were required to use a pulse oximeter, or O2 meter, which is a commonly used finger clip device. (¶ 25, 32-34, 59, 66) Additionally, Soluta nurses were required to use a stethoscope to obtain observations of bronchial breath sounds, such as wheezing, which is relevant to the patient's lung and breathing condition. (¶¶ 32, 66, 69, 82)

At least six Soluta nurses purported to participate in providing SVN treatments to Hall.[3] (¶¶ 22, 23, 31, 36, 56, 58, 63, 79) Treatments occurred in an area that was monitored by video surveillance, and no treatments occurred out of camera view. As determined during the criminal investigation into Hall's death by the Texas Rangers, video evidence shows that the nurses rarely used the necessary pulse oximeter to obtain Hall's oxygen saturation levels, either before or after his SVN treatment. (¶¶ 69, 78, 79) Video evidence shows approximately 60 total treatments between June 24 and July 11, 43 of which were not logged in the SVN Treatment Flo-Sheet. (¶ 79 [Item 2.5]) Eleven times there was no nurse involvement, and Hall administered his own medication. (¶ 79 [Items 2.4, 2.5]) Out of the 60 treatments, Hall's O2 levels were checked only 7

[2] A nebulizer machine turns liquid (typically an albuterol solution) into vapor. (¶¶ 66, 68)

[3] To what extent medicine was administered to Hall, particularly when Hall operated the equipment himself, is unknown to Plaintiffs at this time, and will be an issue for discovery.

times before treatment, and just 2 times after treatment. (¶ 79 [Item 2.6]) For none of the entries made on the SVN Treatment Flo-Sheet did nurses use a pulse oximeter to obtain readings. (¶ 69) For only two readings on the Flo-Sheet was the proper procedure somewhat followed: (1) when EMS was called on July 1 when Hall was transported to the hospital; and (2) when Hall was examined on July 11 by Dr. David Willingham, a family practice practitioner who provided sick-call medical services to Soluta on a contract basis. (¶¶ 65, 69 [Ranger comments at p. 38])

Likewise, the nurses never used a stethoscope to obtain observations of Hall's lungs. (¶¶ 34, 43, 61, 69, 79, 82) Without using the pulse oximeter and a stethoscope, it would be impossible to obtain the readings the SVN Treatment Flo-Sheet purports to show. (¶¶ 32, 34, 69, 79 [Item 14.10]) Nurse Forbush, who represented himself as Soluta's "go-to-guy for everything," admitted that the nurses made entries on the SVN Treatment Flo-Sheet well after the treatment occurred, even though they should not. (¶¶ 48, 50) For all days but July 11, when Hall was transferred to a hospital, the SVN Treatment Flo-Sheet purports to show healthy and stable oxygen levels at 95% or greater, which allegedly improved with treatment. (¶¶ 23, 66 [Willingham comments at p. 37])

As noted in an exchange between Ranger Gray and Dr. Willingham, the purpose of keeping the SVN Treatment Flo-Sheet was to note trends in the patient's condition, including whether the patient's condition was deteriorating over time. (¶ 69) If accurate entries are not recorded by nurses on the Flo-Sheet, a physician reviewing the SVN Treatment Flo-Sheet will be unable to observe a deteriorating condition and timely act to provide further or alternative treatment. (¶ 69) This occurred here. (¶ 79)

The Texas Rangers investigation reached the following conclusions (among others):

14.7. Evidence showed that six (6) nurses who have been identified in this file, had fabricated information on a governmental document. Video evidence showed the nurses had fabricated vital signs and medical checks with regards to Hall's oxygen levels, and breathing examinations.

14.12. The six (6) nurses identified in this file, fabricated a key medical record with regards to Savion Hall, namely the SVN Flo Sheet. This record is used to document Halls long and short term breathing care. Without this information being correct, Doctor Willingham stated he would not be able to make an accurate diagnosis of medical treatment needed.

(¶ 79)

On July 11, following several hours of delay in treatment caused by Defendant Daniel T. Stickel, discussed *infra*, Hall was allowed to seek Dr. Willingham. Willingham summoned EMS which transported Hall to a local hospital for emergency treatment. (¶¶ 69, 70, 74, 79) EMS recorded Hall's blood oxygen level at a critically low 77% (¶ 71) Similarly, Hall's blood pressure was alarmingly low: 77/68. Paramedics further rated Hall at a sub-normal 14 on the Savion Glasgow Coma Scale, noting that Hall was confused and disoriented as to time, place, and person. (¶ 71) Hall's condition had deteriorated to the point that it was unrecoverable, and Hall died in the hospital on July 19, at age 30. (¶¶ 16, 73)

Unlike Hall's first visit to the hospital on July 1, Midland County discharged Hall from custody after Hall was transported to the hospital on July 11. (¶ 72) By doing so, Midland County sought to avoid liability for another jail death; keep Hall's autopsy from becoming public; and avoid being charged for Hall's treatment. (¶¶ 72, 74)

On the evening of July 10 and the morning of July 11, Midland County jailer Daniel T. Stickel was assigned to the guard station in the J Block where Hall was held. (¶ 76) Pursuant to Midland County policy, detainees with breathing difficulties were housed at an extreme distance from the medical facility and had difficulty walking the distance to obtain treatment. (¶¶ 41-42) In connection with the Midland County Sheriff's Department investigation into Hall's death, Stickel prepared three supplemental reports: one "Inmate Injury" report, and two "Medical Referral

Reports." (¶ 76) Stickel admitted that he reported and logged this information late, and that he should have done at the time of the events. (¶ 76) In the Inmate Injury Report, Stickel states:

> THIS HAS BEEN LOGGED LATE DUE TO A COMMON KNOWLEDGE OF INMATE HALL CONSISTENTLY BEING IN MEDICAL FOR BREATHING TREATMENTS THROUGHOUT THE NIGHT. ALTHOUGH NOT AN EXCUSE, FOR THIS REASON I DID NOT INCLUDE THIS WITHIN MY LOGS.

(¶ 76 [Capital letters in original]). Similarly, the first Medical Referral contains the notation: "THIS INCIDENT WAS REPORTED LATE.;" and the second the notations: "*LATE ENTRY*" and "LOGGED LATE."

Stickel states that Hall approached him and stated that he needed to "go back down to medical for another breathing treatment." (¶ 76 [Medical Referral at pp. 42-43]) Stickel observed that Hall was "having trouble breathing" and "wheezing for air." (*Id.*) Stickel further states, "DUE TO PRIOR KNOWLEDGE FROM WORKING WITHIN THE SPECIAL HOUSING UNIT I KNEW THAT THE ON-DUTY NURSE WOULD NOT ALLOW FOR INMATE HALL TO RETURN TO MEDICAL WITHIN 4-5 HOURS OF HIS LAST TREATMENT." (*Id.*) Stickel states that he sought to verify the information with another officer who offered the same information. (*Id.*) Stickel told Hall that this was the "protocol," and sent Hall back to his assigned housing. (*Id.*) Stickel additionally states that he checked on Hall multiple times and confirmed that "he was breathing, although with difficulty." (*Id.*) Stickel reported that Hall told him that "he 'was not gonna make it' as in reference to him about to pass out."

Hall again approached the guard station at approximately 6:15 a.m. seeking assistance. (¶ 76 [Medical Referral at pp. 43-44]) Stickel noted that Hall was wheezing and having trouble breathing, and he was leaning on the guard station indicating that he was having trouble standing and close to passing out. (*Id.*) Hall again stated that he "was not gonna make it." Stickel repeated

the protocol of waiting 4 to 5 hours between breathing treatments. (*Id.*) Stickel states that he called the special housing unit (apparently the jail's term for an infirmary), but he received no answer and did not try again. (*Id.*) Stickel noted the inhaler in Hall's hand and asked Hall if he was out of medication, and Hall stated he was not. (*Id.*) Stickel further considered whether to call a medical emergency, but he did not. Stickel stated:

> UPON RECOLLECTION OF THE SITUATION, AS A SECURITY OFFICER, I SHOULD HAVE GUARANTEED WHAT THE CALL SHOULD HAVE BEEN BY CONTACTING MEDICAL UNTIL THEY ANSWERED. BY GOING OFF OF MY BEST JUDGEMENT WITH THE INFORMATION I HAD BEEN GIVEN **I WAS NOT GOING TO CALL A 'MEDICAL EMERGENCY' UNLESS INMATE HALL BECAME UNRESPONSIVE OR LOST CONCIOUSNESS**.

(*Id.* [emphasis added])

Shortly before 7:00 a.m., Officer Clark reported for her shift as Stickel's relief and instructed Stickel to take Hall to medical for a breathing treatment. (¶ 76) This was an hour and a half before the time that Stickel claims to have believed Hall was permitted another breathing treatment. (¶ 76) As noted *supra*, this is when Hall saw Dr. Willingham, who called EMS. Nowhere in his reports does Stickel claim to have contacted any medical professional regarding Hall's condition or to have reported Hall's symptoms as Stickel observed them. (¶ 76)

Pursuant to Midland County policy, Stickel was operating pursuant to a temporary jailer's license. (¶¶ 64, 94) A temporary jailer's license requires no training. (¶ 94) Stickel had only 6 weeks experience working at a jail and had received no training. (¶ 94) Midland County put Stickel in charge of the J Block guard station nonetheless. (¶ 76)

Plaintiffs allege that due to the sheer number of Soluta employees acting at the behest of Soluta and Midland County who falsified records, failed to provide medical treatment to Hall, and took other actions referenced in Plaintiffs' complaint, that what occurred to Hall was the product of an unwritten policy, custom, and practice of Soluta and Midland County with regard to inmates

in the Midland County jail. (¶ 91) Plaintiffs additionally allege other policies which alone or in interaction with other policies were a moving force in causing Hall's suffering and death. These include understaffing  medical personnel at the Midland County jail and underserving those it detained in order to save money (¶¶ 72, 92); employing and placing in positions of responsibility jailers with temporary jail licenses who have little or no training (¶ 93); allowing jailers not to call a medical emergency, and thus not to obtain EMS or other appropriate medical personnel, unless and until an inmate was unresponsive or unconscious (¶ 94); and housing prisoners, such as Hall, and who needed continuous and vitally important medical care, too far from the medical station. (¶ 90) Midland County's unwritten policies, customs, and practices as alleged in the Complaint were adopted and maintained with deliberate indifference to detainee safety, and alone or in combination were a moving force in causing Hall's pain, suffering, and death. (¶¶ 4-12, 72, 83, 86, 89, 120, 122, 123) These policies alone and in combination with others also contributed to a history of jail deaths. (¶¶ 95-104)

### III.    Legal Standards.

A.    Pleading Standards

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint "does not need detailed factual allegations," but the facts alleged "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

B.    Rights of a Detainee to Medical Care, Protection, and No Punishment.

The State has an affirmative duty to protect pretrial detainees who retain all procedural and substantive due process guarantees under the Fourteenth Amendment. *Hare v. City of Corinth,*

*Miss.*, 74 F.3d 633, 639 (5th Cir. 1996) (en banc). "[U]nder the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). Additionally, "[t]he Due Process Clause of the Fourteenth Amendment guarantees that a person detained by the police is entitled to medical care." *Carter v. Reach*, 399 F. App'x 941, 942 (5th Cir. 2010).

Constitutional challenges by pretrial detainees may be brought under two alternative theories: (a) as an attack on a 'condition of confinement' or (b) as an 'episodic act or omission.' Episodic acts or omissions occur where the complained-of harm is a particular act or omission of one or more officials. *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 526 (5th Cir. 1999) (citing *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997)). Under current Fifth Circuit law,[4] "To prove an underlying constitutional violation in an individual or episodic acts case, a pre-trial detainee must establish that an official acted with *subjective* deliberate indifference." *Hare*, 74 F.3d at 649 n. 4. Although deliberate indifference is an extremely high standard, it is not an impossible burden, and what a prison official subjectively knew is a question of fact subject to demonstration in the usual ways. *See, e.g., Sanchez v. Oliver*, 995 F.3d 461, 473-75 (5th Cir. 2021). "Subjective deliberate indifference means 'the official had subjective knowledge of a substantial risk of serious harm to a pretrial detainee but responded with deliberate indifference to that risk.'" *Olabisiomotosho*, 185 F.3d at, 526 (citing *Hare*, 74 F.3d at 650)). A plaintiff must prove: (1) that each defendant had subjective knowledge of facts from which an inference of substantial risk of serious harm could

---

[4] As set forth in Plaintiff's Complaint, and to preserve the issue for review in the event of any appeal, Plaintiffs maintain that Fifth Circuit precedent is contrary to United States Supreme Court precedent in *Kingsley* applying on objective standard to pretrial detainee claims, and therefore should be reconsidered. (¶¶105-109)

be drawn, and (2) that each defendant actually drew that inference. *See Tamez v. Manthey*, 589 F.3d 764, 770 (5th Cir. 2009); *Trevino v. Hinz*, 751 F. App'x. 551, 554 (5th Cir. 2018).[5]

C.    *Monell* Liability.

A governmental entity can be held accountable for an episodic act or omission if: (1) the governmental employee was subjectively indifferent, and (2) the employee's act "resulted from a municipal policy or custom adopted or maintained with objective deliberate indifference to the [plaintiff]'s constitutional rights." *Olabisiomotosho*, 185 F.3d at 526. The same facts may also give rise to governmental liability on a conditions of confinement theory, which the plaintiff may plead in the alternative. *Sanchez v. Young Cty., Texas*, 866 F.3d 274, 279 n. 3 (5th Cir. 2017) Conditions of confinement are attacks on general conditions, practices, rules, or restrictions of pretrial confinement. *Hare*, 74 F.3d at 644. "Practices that are 'sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct,' can represent official policy." *Sanchez v. Young Cty., Texas*, 956 F.3d 785, 791 (5th Cir. 2020) (citing *Hare*, 74 F.3d at 645). "This is because pervasive practices can be evidence that the official policymaker knew of and acquiesced to the misconduct, making the municipality culpable." *Id.* (citing *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)). In a conditions of confinement case, the reasonable relationship test set out in *Bell v. Wolfish*, 441 U.S. 520, 535 (1979), should be applied. *Scott v. Moore*, 114 F.3d 51, 53 n.2 (5th Cir. 1997). A constitutional violation exists if the condition of confinement is not reasonably related to a legitimate, non-punitive governmental objective. *Id.* (citing *Bell*, 441 U.S. at 539). "The issue is whether the conditions 'amount to punishment." *Sanchez*, 956 F.3d at 791.

---

[5] The Fifth Circuit recently confirmed that a third element sometimes mentioned, that the defendant subjectively intended that harm occur, is outdated and does not survive recent Supreme Court authority. *See Garza v. City of Donna*, 922 F.3d 626, 634-36 (5th Cir.*), cert. denied sub nom. Garza v. City of Donna, Texas*, 140 S. Ct. 651 (2019).

A municipal policy must be the moving force behind a violation. *See Alvarez v. City of Brownsville*, 904 F.3d 382, 389 (5th Cir. 2018). That is, plaintiffs must show a causal link between the policy and the violation. *Piotrowski v. City of Houston*, 237 F.3d 567, 580 (5th Cir. 2001). For a policy to be a moving force behind the violation of a constitutional right, the failure of the policy or omission must be "closely related to the ultimate injury." *Canton,* 489 U.S. at 391. It is exceedingly rare that a plaintiff will have access to (or personal knowledge of) specific details regarding the existence or absence of internal policies or training procedures prior to discovery. *Thomas*, 800 F. Supp. 2d at 842-43. "Where a plaintiff provides more than a boilerplate recitation of the grounds for municipal liability, and instead makes some additional allegation to put the municipality on fair notice of the grounds for which it is being sued, 'federal courts and litigants must rely on summary judgment and control of discovery to weed out unmeritorious claims . . . ..' " *Thomas*, 800 F. Supp. 2d at 844–45 (quoting *Leatherman*, 507 U.S. at 168–69, 113 S.Ct. 1160)).

Policies should not be viewed in isolation but should be considered in the context of how policies interact with one another. *See Sanchez v. Young County, Tex.*, 956 F.3d 785, 796 (5th Cir. 2020) ("Given the different, compounding ways that these alleged policies might interact, a jury could reasonably conclude that they had a "mutually enforcing effect" that deprived decedent pretrial detainee of needed medical care.); *M.D. ex rel. Stukenberg v. Abbott*, 907 F.3d 237, 254 (5th Cir. 2018)). "Courts 'may . . . consider how individual policies or practices interact with one another within the larger system.' ").

A plaintiff can prove the existence of a de facto policy through the "consistent testimony of jail employees," or when the policymaker knows about a misconduct yet fails to take remedial action or discipline employees. *Sanchez*, 956 F.3d at 793-94 (citing, *inter alia*, *Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir. 1985)). Similar unconstitutional conduct by multiple

employees is also indicative of a policy. When numerous officers behave similarly in response to the same situation, it is reasonable to conclude that their conduct is a product of policy rather than anecdotal. *See Grandstaff*, 767 F.2d at 171.

D.    Qualified Immunity.

The doctrine of qualified immunity protects a government official from civil liability for damages that occurred because of the official's performance of discretionary functions, if the official's acts were objectively reasonable in light of the clearly established law at the time of the action. *Thompson v. Upshur County, Texas*, 245 F.3d 447, 456 (5th Cir. 2001). The court conducts a two-part inquiry. *McClendon v. City of Columbia*, 305 F.3d 314, 322 (5th Cir. 2002). First, the court asks "whether a constitutional right would have been violated on the facts alleged." *Id.* at 322-23. Second, the court looks at whether the constitutional right was "clearly established." *Id*. at 323. "Clearly established" means that the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). An official's acts are objectively reasonable "unless all reasonable officials in the defendant's circumstances would have then known that the defendant's conduct violated the United States Constitution or the federal statute as alleged by the plaintiff." *Thompson*, 245 F.3d at 457 (emphasis in original).

If a state official intentionally delays a pretrial detainee's access to medical treatment and the official knows that the detainee has a life-threatening or urgent medical condition that would be exacerbated by delay, this establishes deliberate indifference. *Tamez v. Manthey*, No. CV B-07-213, 2008 WL 11451445, at *8 (S.D. Tex. Sept. 18, 2008) (citing *Lancaster v. Monroe County, Ala.*, 116 F.3d 1419, 1425 (11th Cir. 1997); *Hill v. Dekalb Regional Youth Detention Center*, 40

F.3d 1176, 1186-87 (11th Cir. 1994) ("knowledge of the need for medical care and intentional refusal to provide that care constitute deliberate indifference")).

## IV. Argument.

### A. Midland County's *Monell* Liability.

Midland County argues that it cannot be liable for the unconstitutional conduct of its contractor, Soluta, Inc. Midland wrongly analogizes to respondeat superior liability. This issue is one of delegation of policymaking authority, not respondeat superior liability. Midland may not avoid its constitutional responsibility to provide medical care and safe housing by delegating its healthcare responsibilities to a private contractor. The issue is well summarized by the court in *Rodriguez v. S. Health Partners, Inc.*, No. 3:20-CV-0045-D, 2020 WL 7056336, at *13 (N.D. Tex. Dec. 2, 2020):

> As a preliminary matter, the court notes that Navarro County and SHP can both be held liable under § 1983 for the policies at issue. The Supreme Court has stated that "there will be cases in which policymaking responsibility is shared among more than one official or body." *Praprotnik*, 485 U.S. at 126. The Court has also explained that if "a city's lawful policymakers could insulate the government from liability simply by delegating their policymaking authority to others, § 1983 could not serve its intended purpose." *Id.*; *see also King ex rel. Estate of King v. Kramer*, 680 F.3d 1013, 1020 (7th Cir. 2012) ("The County cannot shield itself from § 1983 liability by contracting out its duty to provide medical services."); *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 705 (11th Cir. 1985) ("Although [a private medical-care provider] has contracted to perform an obligation owed by the county, the county itself remains liable for any constitutional deprivations caused by the policies or customs of the [provider]. In that sense, the county's duty is non-delegable."). Accordingly, if the court were to ultimately conclude that Navarro County *did* delegate policymaking authority to SHP, such a holding would not of itself preclude Navarro County from also being held liable under § 1983. In that sense, Rodriguez has adequately pleaded the second *Monell* element with regard to both SHP and Navarro County for the policies at issue.

*See also West v. Atkins*, 487 U.S. 42, 56, 108 S.Ct. 2250, 2259 (1988) (contracting out prison medical care does not relieve state of its constitutional duty to provide adequate medical treatment to those in its custody and does not deprive state's prisoners of means of vindication of their Eighth

Amendment rights under § 1983). Thus, notwithstanding that Midland chose to delegate its policymaking authority to a private contractor to provide healthcare at its jail, Midland remains responsible for those policies, the same as it would be responsible for any other unconstitutional policies implemented by anyone whom the County clothes with policymaking authority. *See Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690-91, 98 S.Ct. 2018 (1978). When a county delegates policymaking authority of non-delegable duties to others, it does so at its peril.

Additionally, there exists no absolute requirement that a plaintiff establish a "pattern" of conduct to plausibly allege that a governmental entity is on notice of a de facto unconstitutional policy. This issue was recently addressed by the Fifth Circuit in *Sanchez v. Young County*:

> Showing a pervasive pattern is a heavy burden. *See Shepherd v. Dallas County*, 591 F.3d 445, 452 (5th Cir. 2009). But here, no one disputes that the County sheriff is the relevant policymaker or that he knew about the Commission reports and about the details of Simpson's death. And Plaintiffs argue that even after her death, the sheriff neither punished any jailers involved nor took any action to correct the jail's alleged deficiencies. When the official policymaker knows about misconduct yet allegedly fails to take remedial action, this inaction arguably shows acquiescence to the misconduct such that a jury could conclude that it represents official policy. *See Duvall*, 631 F.3d at 208–09 (upholding jury finding that a county jail maintained an unconstitutional condition where there was evidence that the county policymaker knew of unconstitutional conditions yet failed to revise its policies); *Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir. 1985) (holding that, because the city policymaker failed to change policies or to discipline or reprimand officials, the jury was entitled to conclude that the complained-of practices were "accepted as the way things are done and have been done in" that city); *see also Piotrowski*, 237 F.3d at 578 n.18 (explaining that *Grandstaff* affirmed municipal liability because a policymaker's post-incident actions can ratify the prior misconduct). Plaintiffs' evidence therefore creates a fact issue about whether the sheriff acquiesced to the allegedly inadequate monitoring practices.

*Sanchez v. Young Cty., Texas*, 956 F.3d 785, 793 (5th Cir.), *cert. denied*, 141 S. Ct. 901 (2020). In *Grandstaff* the appellate court determined that multiple officers acting similarly during an incident was alone indicative of policy, without the need to establish a pattern. *Grandstaff*, 767 F.2d at 171.

As in *Sanchez* and *Grandstaff*, Plaintiffs pleads the existence of de facto unconstitutional policies of which the relevant policymakers were on notice. Soluta's "go-to-guy," Nurse Forbush, admitted that it was common practice to making entries on the SVN Treatment Flo-Sheet long after the treatment occurred. (¶¶ 48, 50). It is a reasonable inference that if actual readings were being recorded, they would be recorded at the time of treatment, and not at some future time. The failure to log readings at the time of treatment is a situation ripe for abuse. Furthermore, the criminal investigation by the Texas Rangers determined that video evidence showed that none of the six nurses responsible for administering treatments even once used the medical instruments necessary to take the readings they purported to log on the SVN Treatment Flo-Sheet. No one questioned these failures, and no one declined to participate in the truncated procedure. The Rangers reached the only reasonable conclusion: all the nurse entries on the SVN Treatment Flo-Sheet were falsified. A record was created merely for purposes of appearance, not to administer the medical care that Hall required. One can only wonder that if the nurses were willing to forgo even the simple effort of placing an O2 meter on a finger, if they also failed to properly fill the nebulizer with the medicine Hall needed. Regardless, the falsification of a governmental medical record had the obvious foreseeable result that a detainee would die as the result of false information indicating that he was responding treatment, when in fact he was not. (¶ 46)

When so many defendants act in the exact same manner under the same conditions, this is evidence of an ongoing custom that constitutes a de facto policy; i.e., it is "accepted as the way things are done and have been done in" the Midland County jail. *See Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir. 1985). Although it is common defense strategy to downplay *Grandstaff* as some sort of second-class precedent, that is not how the Fifth Circuit treated *Grandstaff* in its

most recent published opinion citing the case. Rather, the circuit court cited *Grandstaff* authoritatively, without any qualification. *See Sanchez v. Young Cty., Texas*, 956 F.3d at 793.

Furthermore, the constitutional violation here is similarly egregious to that in *Grandstaff*. In *Grandstaff* six professional employees (police officers) participated in the misconduct (four of which were sued in *Grandstaff*). *Grandstaff*, 767 F.2d at 165. In the present case six professional employees (nurses) all participated in the constitutional misconduct – misconduct that led to Mr. Hall's death. The decedent in the present case is no less dead than Mr. Grandstaff merely because the misconduct in this case concerns deliberate indifference to a detainee's serious medical needs rather than the wrongful use of deadly force. Moreover, for Hall it was an agonizing death, as he struggled for air and his pleas for help to a seventh employee (Stickel) were ignored. *Grandstaff* cannot be distinguished based upon egregious facts.

B.     Defendant Stickel's liability.

Stickel acknowledges that when he observed Hall during the late evening and early morning hours of July 10 and 11, Hall was breathing "with difficulty," "he was having trouble maintaining his ability to stand," "he was close to passing out," and Hall twice stated that he "was not gonna make it." (¶ 76) Stickel further admits that "the situation gave me nerves." (¶ 76) Moreover, Stickel consciously considered whether to "call a 'medical emergency,' " but determined not to do so unless "Hall became unresponsive or lost consciousness." (¶ 76) Stickel claims to have checked on Hall to determine if he was still breathing. (¶ 76)

By acknowledging that he knew Hall had difficulty breathing, was close to passing out, and that the situation gave Stickel "nerves," Stickel admitted that he subjectively understood that Hall was seriously ill and therefore in need of emergency medical attention. Moreover, Hall's repeated statements that he was not going to make it, indicating that Hall felt so ill that he believed

he would pass out and die, reinforced what Stickel already knew. Stickel's decision to delay calling a medical emergency until Hall actually lost consciousness was absurd; a decision that would only be made by the plainly incompetent or one knowingly violating the law. Stickel's conduct is like failing to stop the bleeding of a wound victim until he loses consciousness, or ignoring the chest pains of a coming heart attack until the victim collapses in full cardiac arrest. Stickel consciously determined that he would allow Hall to suffer, both physically and mentally, until his condition worsened to the point that it became so critical that Hall lost consciousness. This served no legitimate penal purpose. Rather, it was deliberately indifferent to Hall's serious medical needs, and an objectively unreasonable response in light of clearly established law. No reasonable official could have believed it is constitutional to deny medical care to a pretrial detainee known to require emergency medical care. *See, e.g., Tamez*, 2008 WL 11451445, at *8; *Lancaster*, 116 F.3d at 1425; *Hill*, 40 F.3d at 1186-87; *see also Easter v. Powell*, 467 F.3d 459, 463-64 (5th Cir. 2006). Thus, Plaintiffs have stated a plausible claim against Stickel for denial of medical care, failure to provide protection, and infliction of punishment, which defeat Stickel's assertion of qualified immunity.

Stickel's attempt to attribute his decision to medical advice is both contrary to the pleadings and fails to address Stickel's actual conduct. First, in his statements, Stickel acknowledges that he never spoke with a medical professional concerning Hall's condition. (¶ 76) Rather, Stickel claims to have believed that Hall was not eligible for an additional breathing treatment for 4 to 5 hours "due to prior knowledge from working within the special housing unit." (¶ 76) Stickel claims to have called another guard who allegedly confirmed that this was the medical unit's "protocol." (¶ 76) Even if that was the ordinary protocol for breathing treatments, that did not address the acutely ill situation that Stickel confronted. Stickel does not claim to have relayed Hall's current condition to either the other guard or any medical personnel. That the protocol did not apply to this situation

is evident from the fact that Hall eventually was taken to medical personnel at the direction of another officer an hour and a half before Stickel claimed Hall was "eligible," and then quickly transferred by Dr. Willingham to a hospital for emergency treatment. Although it was apparent to Stickel that Hall was critically ill and his condition worsening, Stickel did not bother to consult with any medical personnel regarding Hall's condition.

Furthermore, without question *no medical personnel told Stickel to wait until Hall lost consciousness before declaring a medical emergency*. This was solely Stickel's decision, made without consulting anyone. The likely reason that Stickel did not bother to consult with anyone is that he was acting in accordance with Midland County policy which customarily allowed such discretion to its jail guards, who allowed detainees to become critically ill before seeking treatment. (¶ 94) Stickel's claim to have relied upon the ordinary protocol used for routine breathing treatments when confronted with an obvious medical emergency is disingenuous, and it raises issues of Stickel's credibility as to whether Stickel actually believed what he later claimed. Stickel's post hoc rationalization does not in the least absolve Stickel of his deliberate indifference to Hall's serious medical needs, and his decision to delay seeking medical advice and treatment.

Rule of Evidence 407, Subsequent Remedial Measures, does not apply to Stickel's reports, as they do not concern remedial measures. Instead, each on its face purports to be a late report of information which Stickel concedes he should have recorded at the time of the event. (¶ 76) To the extent that Stickel acknowledges that his performance was deficient, he is merely acknowledging the obvious, and his statements are admissions which may properly be used against him.

Stickel is also not insulated from liability because he claims to have taken some meager measures to assist Hall by checking him periodically to see if he was still breathing and asking if his inhaler was empty. The Fifth Circuit recently emphasized that taking meager measures to

protect detainees will not pass constitutional muster. *See Converse v. City of Kemah, Texas*, 961 F.3d 771, 779 (5th Cir. 2020). "[T]aking some reasonable precautions does not mean the officer, on the whole, behaved reasonably." *Id*. at 779 (citing *Jacobs v. West Feliciana Sheriff's Dep't*, 228 F.3d 388, 395-96 (5th Cir. 2000)). As in *Converse* and *Jacobs*, Stickel's ineffective response was insufficient to "mitigate his errors." *Converse*, 961 F.3d at 779 (citing *Jacobs*, 228 F.3d at 395).

## V.    Alternative Relief – Leave to Amend.

If this Court determines the Complaint is deficient, Plaintiffs should be allowed leave to replead. Courts should not dismiss an action with prejudice until the Plaintiffs have had the opportunity to plead their "best case." *Jacquez v. Procunier*, 801 F.2d 789, 192-93 (5th Cir. 1986). Defendants do not assert that the Complaint *excludes* the possibility of any valid claim, but instead assert only that Plaintiffs have pleaded insufficient facts. In this circumstance, Plaintiffs should be afforded the opportunity to amend if the court finds the Complaint deficient. *See, e.g., United States ex rel. Bennett v. Medtronic, Inc.*, 747 F. Supp. 2d 745, 761 (S.D. Tex. 2010) (citing *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002)).

## VI.   Conclusion.

For the foregoing reasons Plaintiffs pray that the Midland County Defendants' motion be denied. In the alternative, Plaintiffs seek leave to amend and further plead for such other or further relief to which they may be justly entitled.

Respectfully submitted:

Law Offices of Dean Malone, P.C.

_____/s/ T. Dean Malone_____
    T. Dean Malone

T. Dean Malone
Texas State Bar No. 24003265
dean@deanmalone.com
Michael T. O'Connor
Texas State Bar No. 24032922
michael.oconnor@deanmalone.com
Kristen Leigh Homyk
Texas State Bar No. 24032433
kristen.homyk@deanmalone.com
Brandie A. Moser
Texas State Bar No. 24123223
brandie.moser@deanmalone.com
Law Offices of Dean Malone, P.C.
900 Jackson Street, Suite 730
Dallas, Texas 75202
Telephone:    (214) 670-9989
Telefax:    (214) 670-9904

Attorneys for Plaintiff Angela Robinson and
Independent Administrator Rachel Ambler

George Tex Quesada
Texas State Bar No. 16427750
quesada@textrial.com
Sommerman, McCaffity, Quesada & Geisler, L.L.P.
3811 Turtle Creek Blvd., Suite 1400
Dallas, Texas 75219
Telephone:    (214) 720-0720
Telefax:    (214) 720-0184

and

Richard Hardy
Texas State Bar No. 24012785
rhardy@fchclaw.com
Faddoul, Cluff, Hardy & Conaway
1931 E. 37th Street, Suite 2
Odessa, Texas 79762
Telephone:     (432) 335-0399
Telefax:         (432) 335-0398

Attorneys for Plaintiff Clara Busby and Independent
Administrator Rachel Ambler

## CERTIFICATE OF SERVICE

I hereby certify that on October 1, 2021, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Western District of Texas, using the electronic case filing system of the court, and the electronic case filing system sent a notice of electronic filing to the following attorneys:

R. Layne Rouse
Texas State Bar No. 24066007
lrouse@shaferfirm.com
Miles Nelson
Texas State Bar No. 14904750
mnelson@shaferfirm.com
Shafer, Davis, O'Leary & Stoker
1408 W. Wall, Midland, Texas  79701
P. O. Drawer 1552
Odessa, Texas  79760-1552
Telephone:    (432) 695-6178
Telefax:        (432) 335-8329

Attorneys for Defendants Midland County, Texas and Daniel T. Stickel

Ronald A. Ortman
Texas State Bar No. 15324407
ronald@ortmanlawfirm.com
Ortman Law Firm, PLLC
700 N. Saint Mary's St. Ste. 1400
San Antonio, Texas  78205-3535
Telephone:    (210) 361-2425
Telefax:        (210) 251-8244

Attorney for Flor Estrada

Christopher G. Rigler
Texas State Bar No. 24091028
crigler@thompsoncoe.com
Thompson, Coe, Cousins & Irons, L.L.P.
700 North Pearl Street, 25th Floor
Dallas, Texas  75201
Telephone:    (214) 871-8200
Telefax:        (214-871-8209

Zandra E. Foley
Texas State Bar No. 24032085
zfoley@thompsoncoe.com
Cory S. Reed
Texas State Bar No. 24076640
creed@thompsoncoe.com
One Riverway, Suite 1400
Houston, Texas 77056
Telephone: (713) 403-8200
Telefax: (713) 403-8299

Attorneys for Defendants Soluta, Inc., Adeola C. Adesomi, and Timothy Gene Forbush, Jr.

Denis Dennis
Texas State Bar No. 05655566
ddennis@kmdfirm.com
Darrell W. Corzine
Texas State Bar No. 00790510
dcorzine@kmdfirm.com
Kelly, Morgan, Dennis, Corzine & Hansen, PC
P.O. Box 1311
Odessa, Texas 79760-1311
Telephone: (432) 367-7271
Telefax: (432) 363-9121

Attorneys for Defendant Kelly V. Robins

Wesson H. Tribble
Texas State Bar No. 20213960
wtribble@tribblelawfirm.com
Monica C. Vaughan
Texas State Bar No. 00794784
mvaughan@tribblelawfirm.com
Tribble | Ross
6371 Richmond Avenue
Houston, Texas 77057
Telephone: (713) 622-0444
Telefax: (713) 622-0555

Attorneys for Defendant Ebele Ihediwa

Jonathan C. LaMendola
Texas State Bar No. 00792637
jlamendola@cobbmartinez.com
Cobb Martinez Woodward PLLC
1700 Pacific Avenue, Suite 3100
Dallas, Texas 75201
Telephone:    (214) 220-5204
Telefax:       (214) 220-5254

Attorneys for Defendant Lilian Kerubo Okeri


                              /s/ T. Dean Malone
                             T. Dean Malone